Merrimack
No. 90-381

### THE STATE OF NEW HAMPSHIRE

v.

### VICTOR ANCTIL

August 9, 1991

*John P. Arnold,* attorney general (*Tina L. Nadeau,* attorney, on the brief), by brief for the State.

*James E. Duggan,* chief appellate defender, of Concord, by brief for the defendant.

BATCHELDER, J.   The defendant, Victor Anctil, was convicted after a jury trial in Superior Court (*Manias, J.*) of aggravated felo-

nious sexual assault, RSA 632-A:2, XI, and felonious sexual assault, RSA 632-A:3, III. Challenging his conviction, the defendant argues that the trial court erred in allowing a police officer to testify as to her opinion concerning the victim's delay in reporting the sexual assaults, and that the admission of this testimony was not harmless error. We affirm.

The defendant and his wife, Susan Ann Wright, separated in June 1986, and he subsequently moved in with his sister. Two of their children, Robin, age seven, and Victor, Jr., age five, visited their father at his sister's home three weekends a month and one night during the week. During these visits, the defendant would frequently sleep between his children on a sofa bed in the living room.

At trial, Robin testified that while they were in the sofa bed watching television in the dark, the defendant engaged in conduct which, if found by the jury to have occurred beyond a reasonable doubt, would constitute a violation of RSA 632-A:2, XI and of RSA 632-A:3, II. Robin was underneath the covers at the time, and Victor, Jr., was lying with his back turned toward them, watching television. The defendant warned Robin "not to tell" or "[h]e would try and hurt himself."

In May 1987, the defendant moved to Virginia, and Robin had no contact with her father after Christmas of 1987. In the spring of 1988, while Robin rode past the State Prison with her family and a young boy for whom her mother babysat, the boy said, "That's where my father lives." Her mother later explained that the boy's father was in prison for "touching" his children.

A few days later, Robin told her young cousin Dawn that her father "was hurting [her] in a way." Dawn convinced Robin to tell her mother about what her father had done to her, and Dawn left a note for Robin's mother, explaining that Robin needed to talk with her. When Robin's mother asked her what was wrong, she was distraught and crying and said, "I think my daddy did something to me he wasn't supposed to do." Robin's mother subsequently contacted Robin's physician, who referred her to the New Hampshire Division for Children and Youth Services and the Concord Police Department. Officer Pauline Phelps, a female victimization officer for the city of Concord, conducted a videotaped interview of Robin on June 2, 1988, in which Robin demonstrated, using anatomically correct dolls, how her father had sexually assaulted her.

At trial, Officer Phelps testified as follows:

> "Q. In speaking with Robin, were you able to determine a timeframe in which this had happened?

A. Yes.

Q. And this was quite a while prior to when you were interviewing her?

A. Yes, it was.

Q. What, if any, significance do you attribute to the delay between the time these events occurred and when she spoke with you?"

The defendant objected, because the question was "calling for [the police officer] to give an expert opinion why there is a long period of time between when it happened and when it was reported . . . and she is not an expert." The court overruled the objection, and the prosecutor continued with her questioning: "Do you attribute any significance to the delay between when the events occurred in the summer of 1986 and the point in time when Robin spoke with you in June of 1988?" Officer Phelps responded, "Yes. There have been some changes that might have made it easier for her to speak."

The defendant argues that it was error to admit this testimony, because it did not meet the requirements of either New Hampshire Evidence Rule 702, which allows experts to give opinions, or Rule 701, which permits opinion testimony by lay witnesses when those opinions are "rationally based on the perception of the witness." *Id.* The State concedes that the opinion testimony offered through Officer Phelps was neither proper expert testimony, *see State v. Coleman*, 133 N.H. 713, 715, 584 A.2d 755, 757 (1990), nor proper lay opinion testimony, *see Heath v. Joyce*, 114 N.H. 620, 622, 326 A.2d 260, 262 (1979). Instead, the State maintains that the admission of Officer Phelps's opinion was harmless beyond a reasonable doubt. *See State v. Ruelke*, 116 N.H. 692, 694, 366 A.2d 497, 498 (1976) (where it can be said beyond a reasonable doubt that the inadmissible evidence did not affect the verdict, error is harmless and court will uphold the conviction).

The defendant contends that Officer Phelps's testimony regarding the delay in reporting the assaults directly undermined his defense that Robin fabricated the allegations to bring her father back to New Hampshire. However, our review of the record reveals ample evidence, other than Officer Phelps's opinion testimony, that the delay was attributable to other factors. First, Robin testified that she was "embarrassed" by the assaults and, therefore, she may have been encouraged to talk about them by the revelation that a young friend's father was in the State Prison for "touching" his children. Second, she confided in her cousin Dawn, because she felt that Dawn

"was someone I could trust that wouldn't tell the whole wide world." Third, Robin testified that she didn't want everybody to know because "I didn't want them to not like my dad." Finally, she testified that her father had warned her not to tell and had threatened "to try and hurt himself" if she did tell. Consequently, Officer Phelps's testimony that the delay in reporting the assaults was due to "family factors" and "some changes that might have made it easier for her to speak" only adds to the compelling testimony of Robin herself. Moreover, the testimony that was most damning to the defendant was Robin's descriptive account of the sexual assaults, not her reasons for the delay in reporting them, and this testimony was unaffected by Officer Phelps's opinion concerning the delay. Consequently, we hold, beyond a reasonable doubt, that Officer Phelps's opinion testimony, although erroneously admitted, did not affect the verdict. *See State v. Ruelke supra.* Accordingly, we affirm.

*Affirmed.*

All concurred.