Strafford
91-297

### THE STATE OF NEW HAMPSHIRE

### v.

### JEFFREY REYNOLDS

November 4, 1992

*John P. Arnold*, attorney general (*Tina L. Nadeau*, assistant attorney general, on the brief and orally), for the State.

*W. Kirk Abbott, Jr.*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

BATCHELDER, J. The defendant, Jeffrey Reynolds, was convicted after a jury trial in Superior Court (*Dunn*, J.) of two counts of aggravated felonious sexual assault and one count of felonious sexual assault. On appeal he argues: (1) that one of the indictments charging aggravated felonious sexual assault should have been dismissed for alleging "knowingly" as the mental element rather than "purposely"; and (2) that the trial court erred in allowing a state trooper, during his testimony, to comment on the credibility of the victim. Because we hold that the testimony at issue was erroneously admitted and that the State has failed to prove beyond a reasonable doubt that this error was harmless, we reverse.

The facts, briefly, are as follows. The defendant met Paula L. in 1985 when Paula and her daughter, Amy, lived in a house on Barrett

Street in Lisbon. He moved in with them in January 1986. In August 1987, the three moved to Madbury, where they lived with Paula's sister for several months. All three shared one room in the basement. According to Amy's trial testimony, it was during this period, when Amy was eight years old, that the defendant first sexually assaulted her. Amy testified that the defendant touched her vagina, and forced her to perform fellatio, to masturbate him, and to lie on top of him and "go up and down." Although, from her testimony, sexual intercourse did not occur, she stated it was "close to it."

Amy told her cousin about the incident some time later and eventually discussed it with her mother. Amy, however, also told her mother that her report of abuse was a lie, explaining at the trial that the defendant had threatened her mother's life if Amy disclosed the abuse. Although Paula testified that she nevertheless believed her daughter's claim of abuse, she did not report the incident to the authorities at that time. Amy testified at trial that the defendant assaulted her in Madbury "[a]pproximately twenty" times.

The defendant, Paula, and Amy soon moved again, eventually returning to Lisbon, where they rented an apartment. According to Amy, the defendant sexually assaulted her again in Lisbon, in the same manner as before, approximately thirty times. As the relationship between Paula and the defendant deteriorated, the defendant moved out. After he left, Amy told her mother about the more recent sexual assaults, and Paula then reported the abuse to the police. Amy was interviewed by State Trooper Michael Marshall and told him that the defendant had touched her vagina and made her perform fellatio. A subsequent physical examination showed no evidence of penetration.

At trial the defendant denied all the allegations. He testified that Amy was occasionally present when he and other adults talked about sex, and that he and Paula sometimes had sex while Amy was in their group bedroom in Madbury.

The defense also called Trooper Marshall as a witness. In addition to interviewing Amy, Trooper Marshall had spoken with her mother, and he testified that the two had given inconsistent accounts with respect to the chronology of the Lisbon allegations. He also stated that Amy had told him that the defendant had assaulted her once in Madbury and four times in Lisbon, contradicting Amy's trial testimony of twenty and thirty times, respectively.

On cross-examination Trooper Marshall was asked whether he had any reason to disbelieve what Amy had told him regarding the allegations of fellatio. Over the defendant's objection he was permitted

to answer: "No. I had no grounds to disbelieve anything she told me." Later, on recross-examination, the prosecutor asked: "Would you say that there's a big difference between twenty incidents of fellatio and one incident?" Arguing that the question called for an opinion, the defense again objected. The court permitted the question, and the trooper responded: "I would have to give that answer in the context of this whole case, and that definitely would call for an opinion. And what she told me that time, no, I don't find that surprising that that might happen, that there could be a difference of nineteen." Trooper Marshall testified that he had participated in other child sexual assault investigations.

■  The defendant first challenges the aggravated felonious sexual assault indictment that alleged that he acted "knowingly" rather than "purposely." We have recently decided this issue against him, holding in *State v. Ayer*, 136 N.H. 191, 612 A.2d 923 (1992), that for a conviction of aggravated felonious sexual assault the State need only prove that the defendant acted knowingly.

■  Next, the defendant contends that the court erred in admitting the trooper's testimony quoted above, arguing that it amounted to improper comment on the victim's credibility. The State concedes that the trooper's responses were inadmissible lay opinion evidence. *See* N.H. R. Ev. 701; *State v. Anctil*, 134 N.H. 623, 625, 598 A.2d 213, 214 (1991); *cf.* N.H. R. Ev. 702 (expert opinion testimony). The only question before us, therefore, is whether the admission of Trooper Marshall's opinion testimony was harmless beyond a reasonable doubt. *See Anctil*, 134 N.H. at 625, 598 A.2d at 214. The burden to establish the harmlessness of this error lies with the State. *State v. Bujnowski*, 130 N.H. 1, 6, 532 A.2d 1385, 1388 (1987).

This case turned on the credibility of the alleged victim, eleven years old at the time of the trial and the only witness for the prosecution. During intense cross-examination by the defense, inconsistencies were revealed between Amy's trial testimony and her previous *voir dire* testimony. For example, at trial she denied that the defendant had performed sexual intercourse with her. She admitted, however, that she had previously testified that he had. She also admitted that, whereas at trial she had testified to thirty incidents in Lisbon, her *voir dire* testimony was that the assaults occurred on approximately nine occasions. In addition, Amy admitted that she has had a problem with telling lies and that, despite knowing that doing so will get her into trouble, she is sometimes unable to stop.

More inconsistencies surfaced during direct examination of Amy's mother, Paula, testifying for the defense. Amy had testified that she

told her mother, in the course of only one conversation, that the defendant had abused her twenty times in Madbury. Her mother maintained, on the other hand, that she and Amy had had more than one discussion on the subject, and that Amy had said the abuse occurred three or four times. In her testimony Amy also denied having told her mother that any incidents occurred at their Barrett Street home in Lisbon prior to moving to Madbury, insisting that the defendant had not lived with them on Barrett Street. Paula, however, remembered Amy telling her of one incident in Madbury and of others that had occurred previously on Barrett Street. According to Paula, the defendant did live with them in their Barrett Street home. In addition, while Amy testified that during a single conversation with her mother she had described the assaults in the same specific manner as at trial, Paula testified that Amy did not tell her the details in their first conversation; she learned of them from Amy later.

Added to the discrepancies between the testimony of mother and daughter was Paula's own self-contradictory testimony. When asked by the prosecutor on cross-examination if she had merely assumed from what Amy told her that several incidents had occurred on Barrett Street, Paula answered yes. On re-direct, however, Paula stated that Amy had in fact specifically identified the house on Barrett Street as the location of some of the assaults.

Against this backdrop, together with the defendant's in-court denial, we turn to the trooper's testimony, in particular the second portion at issue. His opinion—an attempt to reconcile the variance between alleging twenty incidents and one—went to the heart of the only real issue in the case, the credibility of the complaining witness. It was directly relevant to the discrepancy between her trial and pretrial versions of what had occurred. Expressing the opinion that a difference between twenty claimed incidents and only one was not surprising, the trooper discounted the significance of this difference. He in essence told the jury that such discrepancies should not diminish the victim's credibility. This, however, was precisely what the jury had to decide for itself.

The obligation to determine the credibility of witnesses belongs to the jury. *State v. Cote*, 129 N.H. 358, 369, 530 A.2d 775, 781 (1987). When the testimony of opposing witnesses conflicts, the jury may understandably wish to be unburdened of the difficult but necessary task of deciding who is telling the truth. Upon hearing a law enforcement officer, experienced in investigating alleged sexual assaults of children, express an opinion bolstering the credibility of the

child witness, the jurors here may well have felt relieved that they would not have to make this difficult judgment themselves, and may have transferred the obligation to the officer. *Cf. State v. Campbell*, 127 N.H. 112, 116, 498 A.2d 330, 333 (1985) (where expert testifies regarding witness credibility, "aura of importance . . . would raise the risk that jurors . . . would surrender their responsibility to use their own common sense in judging a witness's credibility").

■ Given that the case was ultimately and essentially a credibility contest between the victim and the defendant, and that the victim's credibility had been attacked by the defense with some success, we are not convinced beyond a reasonable doubt that the erroneously admitted lay testimony did not influence the jury's determination to believe the victim over the defendant. We therefore hold that the introduction of this testimony was not harmless error. In light of this holding, we need not examine the other challenged portion of the testimony.

*Reversed and remanded.*

All concurred.