Hillsborough-northern judicial district
No. 2006-800

THE STATE OF NEW HAMPSHIRE

v.

ROBERT LOPEZ

Argued: October 17, 2007
Opinion Issued: November 9, 2007

*Kelly A. Ayotte*, attorney general (*Charles J. Keefe*, assistant attorney general, on the brief and orally), for the State.

*Theodore Lothstein*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

GALWAY, J. The defendant, Robert Lopez, appeals his conviction following a jury trial in the Superior Court (*Lewis*, J.) for first degree murder. *See* RSA 630:1-a (2007). We affirm.

The record supports the following facts. In January 2005, the defendant met Brandi Bernard at Labor Ready, a temporary employment agency in Manchester for which Bernard worked. Bernard and the defendant began dating in February 2005, and within a month had moved in together. According to various witnesses, the couple often argued, and during their arguments would scream, yell and engage in name-calling. Also, Bernard's friend testified that on one occasion while he was driving the defendant to work, the defendant stated that Bernard would sometimes make him very angry and he punched the dashboard of the car, cracking it.

Shortly after their relationship began, the defendant became very possessive and began regularly checking on Bernard's whereabouts. A source of the defendant's possessiveness was his jealousy over Bernard's relationship with a former boyfriend. The defendant's co-worker testified that the defendant stated that if he ever caught Bernard cheating, he

would kill her. Other witnesses also described various instances of the defendant's hostile or threatening behavior toward Bernard.

In July 2005, Bernard told several friends and family members that she wished to end the relationship. Also around this time, Bernard disclosed that she was pregnant with the defendant's child. Shortly after stating that she wished to end the relationship, Bernard broke up with the defendant and moved out of the couple's apartment and into her mother's home. Over the ensuing days, various relatives helped Bernard move her belongings out of the apartment. On one such occasion she and the defendant argued, and the defendant stated that he wished Bernard dead, or that her baby be born with mental retardation. Bernard, in turn, insulted the defendant. Eventually, the argument ceased and the defendant helped Bernard move.

Within a few days after moving out, Bernard, believing the defendant had no place to stay, asked her mother if the defendant could move in with them. The defendant was permitted to move in for one week, during which he and Bernard shared a bedroom. For the next several days the relationship between Bernard and the defendant was generally good.

On Saturday, July 21, 2005, Bernard and the defendant were arguing in the bedroom they shared. At some point during the argument, the defendant went downstairs to the kitchen and retrieved a hammer. He then returned upstairs and beat Bernard to death. A later autopsy revealed more than twenty blows to Bernard's head and face, which fractured her skull, as well as other blows to her chest, arms, hand and stomach.

After killing Bernard, the defendant left the house, passing Bernard's stepfather on the way. He noticed nothing out of the ordinary except that the defendant appeared to be in a hurry and that he drove off in Bernard's car, even though he did not have a driver's license. The defendant drove to his sister's home, where he changed his shoes and left his boots behind. He then drove off in his sister's truck. When the defendant's sister discovered her truck missing, she called the police. She also called Bernard's mother, who, after their conversation, went to the defendant's sister's home.

When the police arrived at the defendant's sister's home, Bernard's mother told them that she believed Bernard might be in trouble. The officers inspected the defendant's boots and discovered blood on them. Other officers were dispatched to Bernard's mother's home where Bernard's body was discovered at the foot of her bed. The hammer was eventually found hidden beneath the sink under a bag and a box of cleaning supplies. A blood-stained t-shirt was found at the bottom of a laundry bag.

After taking his sister's truck, the defendant drove to his mother's home in Newark, New Jersey. When he arrived he was met in the yard by his

aunt, who asked him why he had killed Bernard. The defendant replied that he had "no regrets." The defendant's brother, a Newark police officer, was in the house and called the police upon the defendant's arrival. Shortly thereafter, Newark police arrived and arrested the defendant.

On July 23, 2005, two officers from the Manchester Police Department traveled to Newark to interview the defendant. The defendant waived his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and confessed to the officers. In October 2005, the defendant was indicted on one count of first degree murder. At trial, the defendant admitted that he had murdered Bernard, but argued that he acted impulsively and not with premeditation and deliberation. The defendant was convicted of first degree murder. This appeal followed.

On appeal the defendant contends that the trial court erred by permitting the State to introduce an inculpatory statement made at his mother's home, while excluding an exculpatory statement also made there, and by permitting the State to introduce evidence that he did not cry during his interview with New Hampshire police officers, while excluding evidence that he cried during an interview with New Jersey police officers. Additionally, the defendant contends that it was plain error for the trial court to allow the State, while cross-examining him, to ask him whether other witnesses had lied to the jury. We address each argument in turn.

Upon arriving at his mother's home, the defendant's aunt asked him why he had killed Bernard, and he stated, "I wish I could have took [*sic*] her head, that f***ing bitch. No regrets. I have no regrets." The defendant's mother was not present when this statement was made, but arrived shortly thereafter. After the defendant had been arrested and was being escorted to a police cruiser, the defendant's mother asked him why he had killed Bernard, and he stated that he had "snapped." The defendant's aunt and brother overheard the statements made to his mother. At trial, the defendant sought to admit testimony from his aunt and brother about his statement to his mother, but the trial court excluded the testimony as inadmissible hearsay. The defendant argues that testimony about his statement to his mother should have been admitted under the doctrine of verbal completeness.

■ The admissibility of evidence is generally within the trial court's sound discretion and we will not reverse the trial court's admission of evidence absent an unsustainable exercise of discretion. *State v. Ellsworth*, 151 N.H. 152, 159 (2004). To show that the trial court's exercise of discretion is unsustainable, the defendant must show that the decision was clearly unreasonable to the prejudice of his case. *Id.*

> Under the doctrine of verbal completeness, a party has the right to introduce the remainder of a writing, statement, correspondence, former testimony or conversation that his or her opponent introduced so far as it relates to the same subject matter and hence tends to explain or shed light on the meaning of the part already received. This doctrine exists to prevent one party from gaining an advantage by misleading the jury. Thus, there are two requirements to trigger the doctrine respecting conversations: first, the statements must be part of the same conversation; and second, admission of only a portion would mislead the jury.

*Id.* (citations and quotations omitted).

■ The trial court found that the defendant's initial statement to his aunt and his later statement to his mother were not part of the same conversation. Therefore, the trial court permitted the defendant's aunt to testify about the defendant's first statement to her, but did not permit the defendant's aunt or brother to testify about the later statement to the defendant's mother. We agree that the statements were not part of the same conversation. The defendant's initial statements to his aunt were made immediately upon his arrival at his mother's home, when his mother was not present. The allegedly exculpatory statements to his mother were made sometime later, after she arrived, and after the defendant had been arrested. The statements simply were not part of the same conversation. Moreover, we conclude that the defendant's later statements, like those in *State v. Douthart*, 146 N.H. 445, 449 (2001), "would not help explain the initial statements because they took place under entirely different circumstances after the defendant had been arrested and charged with murder in the interim, and because the statements are self-serving." Therefore, we conclude that the trial court did not unsustainably exercise its discretion in excluding the later statements.

The defendant next contends that the trial court erred in precluding evidence that he cried during one police interview while admitting evidence of another interview in which he did not cry. After the defendant was arrested, he was interviewed by two New Jersey police officers. During this interview, the defendant was allegedly very emotional and began crying. The trial court prevented the defendant from offering evidence about his demeanor or emotional state during this interview. The trial court did, however, permit him to offer evidence that he had been remorseful.

One day after his interview with New Jersey police, the defendant was interviewed by two New Hampshire police officers. During trial, a

videotape of the defendant's interview with the New Hampshire officers was shown to the jury. In the video the defendant apparently appeared to cry. After the presentation of the video, one of the interviewing officers was asked whether he actually saw any tears during the interview. He responded that he had not. The defendant then sought to introduce evidence that he had cried during the interview with the New Jersey officers on the ground that the State had opened the door to it by asking whether the New Hampshire police had seen any tears. The trial court found that the door was not opened and precluded the testimony. The defendant argues that the trial court erred in excluding this testimony because the State had opened the door to its admission by creating a misleading impression regarding the authenticity of the defendant's emotions. He does not, however, challenge the trial court's initial ruling precluding testimony about his emotional state.

As with the prior issue, we review the trial court's decision on the admissibility of evidence for an unsustainable exercise of discretion. *State v. White*, 155 N.H. 119, 123 (2007). Because the defendant argues that the State introduced admissible evidence that created a misleading impression, we are concerned with the application of the specific contradiction portion of the opening-the-door doctrine. *Id.* at 124. In order for that doctrine to apply, the State must have introduced evidence that provided a justification, beyond mere relevance, for the defendant to introduce evidence that would not otherwise have been admissible. *Id.* The initial evidence must, however, have reasonably misled the fact finder in some way. *Id.* The rule is intended to prevent a party from successfully excluding evidence favorable to his opponent, and then selectively introducing evidence for his own advantage, without allowing the opponent to place the evidence in proper context. *Id.*

The State acknowledged before the trial court that introducing evidence that the defendant did not cry showed that he was attempting to deceive the officers with a display of contrived emotion, as opposed to being genuinely remorseful. The defendant argues that the New Hampshire officer's testimony created a misleading impression because the jury was prevented from learning that the defendant had cried in the first interview and, "[f]rom this, the jury could have inferred that [the defendant's] emotions were genuine, but he did all of his crying in the hours between being arrested by New Jersey police officers, and being interrogated by New Hampshire police officers." We do not agree that a misleading impression was created.

The State's question clarified whether the officer observed tears at the time the defendant appeared to be crying, and the officer stated only

that he saw no tears. The officer did not speculate about the genuineness of the defendant's emotions or any motivation the defendant might have had to act as he did. The fact that the lack of tears could be said to lead the jury to a particular conclusion does not mean that the evidence was misleading. Moreover, introducing evidence that the defendant had cried at a different interview, with different officers, on a different day, would not place this evidence in proper context. We conclude that the State did not create a misleading impression that needed to be placed in proper context by introducing evidence of the defendant's emotional state during his interview with the New Jersey police. Finally, we note that the defendant was permitted to introduce other evidence that he cried when speaking with his family prior to and during his arrest. Thus, he had introduced evidence of his prior crying, and the trial court did not err by not permitting him to introduce more of such evidence. *See State v. Morrill*, 154 N.H. 547, 552 (2006).

Finally, the defendant argues that the trial court erred when it permitted the State to ask, while cross-examining him, whether other witnesses had lied to the jury. Generally, we review a trial court's rulings on the scope of cross-examination under an unsustainable exercise of discretion standard. *State v. Wellington*, 150 N.H. 782, 788 (2004). The defendant concedes, however, that there were no objections to the testimony at the time it was made as is generally required, *see, e.g., State v. Blackmer*, 149 N.H. 47, 48 (2003). He argues, therefore, that we ought to review the matter under the plain error rule. SUP. CT. R. 16-A.

■ The plain error rule allows us to consider errors not brought to the attention of the trial court. *State v. Matey*, 153 N.H. 263, 266 (2006). However, the rule should be used sparingly, and should be limited to those circumstances in which a miscarriage of justice would otherwise result. *Id.* For us to find error under the rule: (1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings. *Id.* We have looked to the federal courts' standards for the application of the federal plain error rule to inform our application of the state rule. *State v. Emery*, 152 N.H. 783, 786 (2005); *State v. Taylor*, 152 N.H. 719, 720-21 (2005).

■ On the first criterion, the State concedes that it was error to admit the cross-examination at issue. We agree that requiring a witness to opine upon the credibility of other witnesses is error because such questioning interferes with the jury's obligation to determine the credibility of witnesses, and is not probative in that it requires a witness to testify to things outside of her or his knowledge. Moreover, we are persuaded by the

majority of jurisdictions that have considered the issue that rather than a case-by-case approach, a broad prohibition on questions requiring a witness to comment upon the credibility of other witnesses is the better law. *See Liggett v. People*, 135 P.3d 725, 727, 729-732 (Colo. 2006) (collecting cases). Accordingly, we conclude that permitting the prosecutor to ask the defendant to opine upon the credibility of other witnesses was error.

■ We next consider whether the error was plain. "'Plain' is synonymous with 'clear' or, equivalently, 'obvious.'" *United States v. Olano*, 507 U.S. 725, 734 (1993). "At a minimum, a court of appeals cannot correct an error ... unless the error is clear under current law." *Id.* Thus, an error is plain if it "was or should have been 'obvious' in the sense that the governing law was clearly settled to the contrary ...." *United States v. Gilberg*, 75 F.3d 15, 18 (1st Cir. 1996). "Generally, when the law is not clear at the time of trial, and remains unsettled at the time of appeal, a decision by the trial court cannot be plain error." *Matey*, 153 N.H. at 268.

The defendant contends that the error was plain in light of our prior decisions prohibiting a witness from opining upon the credibility of another witness. We disagree. In *State v. Grierson*, 96 N.H. 36, 39 (1949), we determined that permitting such questioning, while not to be encouraged, was within the trial court's discretion and was not error. Later, in *State v. Glidden*, 122 N.H. 41, 47 (1982), the defendant was asked whether he disputed the testimony of prior witnesses and the trial court permitted the defendant to answer over defense counsel's objections. We noted first that we had never ruled on the propriety of this form of questioning, and that some jurisdictions had held that it was proper to require a witness to state his or her belief as to the correctness of another witness's testimony. *Id.* We also noted that some jurisdictions had rejected questioning that required a witness to comment directly upon the veracity, as opposed to the correctness, of a prior witness's testimony. *Id.* We determined that because the prosecuting attorney had "in effect asked the defendant whether he agreed with the testimony of the other witnesses," the questioning at issue was permissible. *Id.* at 47-48. We also stated, in *dicta*, that one of the reasons the questioning was proper was because "the defendant was not compelled to comment directly on the veracity of the other witnesses." *Id.* at 48.

Most recently, in *State v. Reynolds*, 136 N.H. 325, 328 (1992), a police officer testified that discrepancies in the testimony of a prior witness, the victim in the case, should not diminish her credibility. The State conceded that the testimony was inadmissible lay opinion evidence, but argued that any error in admitting it was harmless. *Id.* at 327. After reaffirming the

rule that the obligation to determine credibility belongs to the jury, we concluded that it was possible the jury abandoned this obligation to the police officer due to his position and experience in evaluating people such as the victim. *Id.* at 328-29. We held that because the case was "essentially a credibility contest," and because the officer had offered inadmissible lay opinion evidence about the victim's credibility, the State had not shown that the officer's testimony did not affect the verdict. *Id.* at 329.

■ While these cases indicate a trend toward limiting testimony or questioning that requires a witness to opine upon the credibility of other witnesses, we have not heretofore held that such questioning is improper. At most, *dicta* in *Glidden* could be read to prohibit such questioning, but we do not believe that this language made it obvious in the sense that the governing law was clearly settled against the admission of such testimony. Further, because there is a split among the jurisdictions that have considered the issue as to whether such questions are always improper, or whether they may be admissible in the discretion of the trial court, *see Liggett*, 135 P.3d at 729-30, we cannot say that the law generally was clearly settled against the admission of this testimony. Accordingly, we conclude that the error in admitting this testimony was not plain.

■ Even assuming that the error in admitting this testimony was plain, we do not agree that the error affected substantial rights and, therefore, the third criterion is not satisfied. Generally, to satisfy the burden of demonstrating that an error affected substantial rights, the defendant must demonstrate that the error was prejudicial, *i.e.*, that it affected the outcome of the proceeding. *Emery*, 152 N.H. at 787. The defendant contends that because the central issue at trial was whether he acted with premeditation, his credibility was of the utmost importance because, "his testimony, if believed by the jury, should have resulted in an acquittal of first-degree murder." The defendant contends, however, that the prosecutor's questions "distorted the jury's determination of [his] credibility in an unfair and prejudicial manner."

We conclude that the prosecutor's questions, while improper, were not prejudicial in light of the overwhelming evidence of premeditation presented at trial. *See United States v. Vitillo*, 490 F.3d 314, 326 (3d Cir. 2007); *United States v. Boyd*, 54 F.3d 868, 872 (D.C. Cir. 1995). There was testimony from numerous witnesses that the defendant had previously wished Bernard and her baby dead, or that he had threatened to kill her. While the defendant challenged some of those statements, he acknowledged that he had previously threatened to kill her. Further, the defendant admitted that when he and Bernard argued on the day of the murder, he thought about killing her prior to going downstairs to retrieve

the hammer. Specifically he testified: "Something in my mind just said: Just kill the f***ing bitch. Go downstairs to the second drawer and grab the hammer and just kill her." Also, he testified that in his confession to the police he stated that when he went downstairs to retrieve the hammer he thought about leaving the house, but instead went back up the stairs and attacked Bernard.

Thus, in the course of his testimony, the defendant admitted or acknowledged that he thought about killing Bernard previously, decided to kill her during the argument by going downstairs to retrieve the hammer, actually left the bedroom and went downstairs to get the hammer, and consciously considered leaving the house before returning upstairs to kill Bernard. We conclude that in light of this testimony and the other evidence noted above, the defendant has not carried his burden to show that the error affected the outcome of the proceeding. Accordingly, we will not reverse the defendant's conviction for plain error.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and HICKS, JJ., concurred.