Rockingham
No. 2010-235

THE STATE OF NEW HAMPSHIRE

v.

PAUL MCDONALD

Argued: September 21, 2011
Opinion Issued: December 28, 2011

*Michael A. Delaney*, attorney general (*Susan P. McGinnis*, senior assistant attorney general, on the brief and orally), for the State.

*Lisa L. Wolford*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, Paul McDonald, appeals his conviction, by a jury, of first-degree murder. *See* RSA 630:1-a, I(a) (2007). On appeal, the

defendant argues that the Trial Court (*Nicolosi*, J.) erred by permitting the State to present certain lay opinion testimony, declining to give the defendant's requested self-defense jury instruction, and prohibiting the defense from referring to the aggravated felonious sexual assault statute in its closing argument. We affirm.

The record supports or the jury could have found the following facts. The victim, Richard Wilcox, owned a three-bedroom home in Danville. Wilcox lived in the house, but rented out the two spare bedrooms. He also worked full time in Burlington, Massachusetts, and owned a 2008 Toyota Tacoma truck.

In March 2008, McDonald moved into Wilcox's home and began renting one of the spare bedrooms. The other bedroom was occupied until late May, when the tenant renting it moved out. Shortly before McDonald moved in, he had only $220.05 in his checking account. By the end of May, his checking account had a deficit of $7.21. At trial, McDonald's ex-wife testified that he had lived in several places and frequently changed jobs. She also testified that since their divorce in 2000, McDonald never seemed to have any money.

McDonald owned a Harley Davidson Ironhead motorcycle, but was interested in purchasing a Harley Davidson Shovelhead. He frequently inquired about purchasing a Shovelhead from Dan Glidden, the owner of a motorcycle repair shop. Glidden was reluctant to part with the motorcycle, and quoted a price of $6,500. According to Glidden, this price was well above what the motorcycle was worth. McDonald attempted to pay the $6,500 with a credit card, but Glidden declined because the card was not in McDonald's name. Glidden later informed McDonald that Dan Eighmey, the owner of a car sales and repair business, also owned a Shovelhead.

Eighmey testified that in mid-to-late May 2008, a man who identified himself as Richard Wilcox, but who was actually Paul McDonald, came to his dealership and inquired about purchasing the Shovelhead. Eighmey also testified that McDonald, posing as Wilcox, was enthusiastic about the motorcycle, and called and visited the dealership several times over the next few weeks to negotiate a purchase. Early during these negotiations, McDonald gave Eighmey the title to Wilcox's 2008 Tacoma. Eighmey testified that McDonald agreed to give him the 2008 Tacoma in exchange for the Shovelhead, a 1994 Tacoma, and $4,200. McDonald, however, repeatedly made excuses, and postponed completion of the transaction for several weeks. Around June 9, Eighmey told McDonald to complete the deal or else Eighmey would put the motorcycle up for sale again. McDonald again requested more time, and agreed to take $1,000 less if Eighmey would hold the motorcycle for another week. Eighmey agreed.

On June 12, McDonald, still posing as Wilcox, completed the transaction. He arrived at Eighmey's dealership a little after 8:00 a.m. and traded Wilcox's 2008 Tacoma for the 1994 Tacoma, the Shovelhead motorcycle, and $3,200. McDonald then went to the motorcycle repair shop and asked Glidden's son, David, to fix the motorcycle that week. David testified that when McDonald arrived, he had something wrapped around his bleeding hand. Some time after leaving the repair shop, McDonald drove to Vermont.

On June 13, in response to a call from Wilcox's employer, Danville Police Sergeant Ryan Furman drove to Wilcox's home to check on his well-being. Finding the front door ajar, Furman entered the premises. Inside, he saw that the living room was orderly and noticed a plate of food on the kitchen counter. He then noticed a hole in the wall next to the counter and proceeded down the hallway. Furman found blood on the ceiling, floor, and walls of the hallway bathroom. He called for assistance. After another officer arrived, the two of them found pools of blood in one of the bedrooms and a towel soaked in blood. Eventually, they found bloody marks on the basement stairs, and blood that led to the corner of the basement, where they discovered the body of Richard Wilcox.

On June 17, McDonald registered the 1994 Tacoma in his brother's name in Vermont. The next day, the police learned that he was staying with friends in Castleton, Vermont. New Hampshire State Police Sergeants Mark Armaganian and Scott Gilbert went there and McDonald agreed to speak with them at the Vermont Police barracks. Once there, Gilbert and Armaganian read McDonald his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and he waived them. Gilbert and Armaganian then questioned him about Wilcox's death.

At first, McDonald claimed that he had been gone and did not know anything about Wilcox's death. A short while later, he admitted that he killed Wilcox, but claimed he only attacked Wilcox because he "snapped" when he woke up with his pants around his ankles and felt Wilcox's mouth on his penis. He told the police that after he killed Wilcox, he panicked, attempted to clean up the blood, and left. He admitted to posing as Wilcox when negotiating the sale with Eighmey, but claimed that the murder was completely unrelated to the plan to steal Wilcox's truck, and described his plan to steal the truck as just a "stupid" idea. At trial, McDonald admitted to causing Wilcox's death. The only issue for the jury was whether he did so in self-defense.

## I

Before trial, the defendant moved to exclude certain opinion testimony from Gilbert and Armaganian regarding the police interrogation. The defendant argued that the officers' "interpretations and observations of

[his] demeanor and body language are inadmissible opinion evidence . . . [that] comment on the credibility of a witness." After a hearing, the trial court denied the defendant's motion, ruling that testimony describing the defendant's body language and demeanor was admissible, as was opinion testimony regarding whether the defendant's emotional reactions appeared genuine.

At trial, only Gilbert testified about the interrogation. During direct examination, the State asked Gilbert to "explain . . . what [he] observed during the course of the interview." Gilbert responded,

> I observed how quickly he was able to turn his emotion on and off. He was succinct and clear to the point on certain questions, and then completely stammering nonsensical to other certain questions. He was able to turn his emotion on and off quickly and easily. . . . [H]is demeanor was . . . his emotion to me seemed very feigned.

A few moments later, the State inquired of Gilbert

> Q: All right. Did you make any observations about his body language throughout the interview?
>
> A: I thought everything was overly — his body motions — emotions were overly dramatic.
>
> Q. Okay. Can you explain what you mean by that?
>
> A: Well, if . . . I asked him a certain question and he says well, no, it would be a very flamboyant no, and he'd — goodness, no. And it's very over exaggerated.
>
> Q: Okay. And since this is being recorded, you kind of raised your eyes and made a, sort of, exaggerated expression on your face.
>
> A: Yeah. There was a lot of, you know, a lot of eye rolling and the hands that go — I — how could you think that? No. That kind of reaction.

The State then distributed a transcript of the interrogation and played a portion of the audio recording of the interview for the jury. The State later played the remainder of the recording for the jury. After playing the second portion of the audio recording, the State asked Gilbert to testify about the defendant's facial expression after Gilbert asked him whether the theft of the truck and the killing of Richard Wilcox were related. Gilbert explained,

"[T]here was a very, I thought, over exaggerated, shook [sic], his eyes bugged out like shock, like oh, my goodness. I never thought of that. How could you possibly think that type of expression."

On appeal, the defendant argues that the trial court erred by allowing the State to present opinion testimony from Sergeant Gilbert about the genuineness of his body language and demeanor during the police interrogation.

A

The admissibility of evidence is a matter left to the sound discretion of the trial court. *State v. White*, 155 N.H. 119, 123 (2007). We will not reverse the trial court's decision to admit evidence absent an unsustainable exercise of discretion. *State v. Lopez*, 156 N.H. 416, 420 (2007). In determining whether a ruling is a proper exercise of judicial discretion, we consider whether the record establishes an objective basis sufficient to sustain the discretionary decision made. *State v. Lambert*, 147 N.H. 295, 296 (2001).

A witness need not qualify as an expert to give testimony in the form of an opinion. *See* N.H. R. Ev. 701. The trial court may permit lay opinion testimony as long as the witness's opinion is "rationally based on the perception of the witness" and helpful to the trier of fact. N.H. R. Ev. 701. However, it is the province and obligation of the jury to determine the credibility of witnesses. *State v. Reynolds*, 136 N.H. 325, 328-29 (1992). Therefore, while witnesses may give lay opinion testimony on a variety of topics, they are not permitted to give lay opinion testimony regarding the credibility of a witness. *Id.* Such testimony invades the province of the jury. *Id.* This prohibition applies with equal force to testimony about a criminal defendant who does not testify as a witness at trial. *See State v. Stott*, 149 N.H. 170, 173 (2003) (analyzing whether police officer's testimony about the police interrogation amounted to impermissible lay opinion on the defendant's credibility).

The parties do not dispute that lay opinion testimony about the defendant's credibility would be inadmissible. Rather, they disagree about whether Gilbert's testimony actually constitutes an opinion about the defendant's credibility. The defendant argues that Gilbert's testimony, such as his statements that the defendant's "emotion . . . seemed very feigned" and that the defendant's emotions were "overly dramatic" and "over-exaggerated," is no different from testimony that the defendant seemed to be lying. The State, on the other hand, contends that Gilbert's testimony expressed only permissible lay opinions about the defendant's body language and demeanor, and did not express any opinion about the defendant's credibility.

█Witnesses, including law enforcement officers, have been permitted to testify about their opinion on topics such as smell, *State v. Brooks*, 126 N.H. 618, 621-22 (1985) (officer permitted to testify that a jacket smelled of kerosene), appearance, *State v. McCue*, 134 N.H. 94, 107 (1991) (officer permitted to "opine" that impressions at crime scene were "drag marks"), and sound, *Heath v. Joyce*, 114 N.H. 620, 622 (1974) (lay witness permitted to testify that a noise sounded "like an engine running at fairly high speed"). In limited circumstances, it is also permissible for a witness to characterize the defendant's demeanor. *See* N.H. R. Ev. 701; *see also Caudill v. Com.*, 120 S.W.3d 635, 663 (Ky. 2004) (permitting lay opinion testimony that the defendant was "laughing and using a mocking tone of voice"); *State v. Stojetz*, 705 N.E.2d 329, 340 (Ohio 1999) (permitting lay opinion testimony that the witness appeared "scared" and "not able to think"). However, the "State may not present evidence to preempt the jury's often difficult job of deciding which [parties and] witnesses are truthful and what evidence is trustworthy." *State v. Huard*, 138 N.H. 256, 259 (1994). Accordingly, a witness may not characterize the defendant's demeanor when the characterization is tantamount to a comment on the defendant's credibility.

Undoubtedly, it would have been permissible in this case for Gilbert to simply describe, without characterizing, the details of the defendant's actions to the jury. *See Stott*, 149 N.H. at 173 (permitting testimony that "amount[ed] to nothing more than a detailed factual narration of [the police officer's] interview with the defendant"); *State v. Kulas*, 145 N.H. 246, 248-49 (2000) (finding that the witness's testimony was not an opinion on the victim's credibility where the testimony related solely to the facts of a discussion with the victim, and the steps taken after that discussion). For example, Gilbert could have testified, as he did, about "how quickly [the defendant] was able to turn his emotion on and off" and that the defendant did "a lot of . . . eye rolling" and allowed the jury to determine the significance of those actions. *See State v. Griffin*, No.#C-020084, 2003 WL 21414664, at *8-9 (Ohio Ct. App. June 20, 2003) (permitting testimony that the defendant "began to cry and sob, but there were no tears").

█ However, Gilbert went further. He characterized the defendant's emotions as "feigned," and described the defendant's body language as over-exaggerated and overly dramatic. This testimony was a comment on the genuineness of the defendant's physical reactions, and was tantamount to a comment on the defendant's credibility. By characterizing the defendant's emotions and body language this way, Gilbert implied that he did not believe the defendant. In other words, Gilbert effectively testified that, in his opinion, the defendant's demeanor demonstrated that he was not being

truthful. Allowing this testimony was an invasion of the province and obligation of the jury to determine credibility. *Huard*, 138 N.H. at 259.

■ The State argues that, if anything, Gilbert's testimony merely amounted to a comment on the credibility of the defendant's demeanor, which is permissible because "there is a distinction between comments on the credibility of a person's physical and emotional reactions while making statements and comments on the credibility of the statements themselves." The State reasons that because a person can feign or exaggerate body language even while telling the truth, commenting on the genuineness of that body language is not improper. The State's argument seems to rely upon the assumption that only a direct statement about the credibility of the defendant is impermissible. However, the prohibition on opinion testimony applies both to testimony that comments on credibility explicitly, as well as testimony that comments on credibility indirectly. *See State v. Viranond*, 212 P.3d 1252, 1256 (Or. 2009) (explaining that a witness cannot make statements that are "tantamount" to a comment on credibility). Although Gilbert did not explicitly state that he believed the defendant's statements were false, his testimony communicated to the jury his doubts about the defendant's overall credibility. This testimony should not have been admitted.

## B

■ The State argues that even if the trial court erred in admitting the testimony, the error was harmless. The State bears the burden of proving that an error is harmless. *State v. Pseudae*, 154 N.H. 196, 202 (2006). An error is harmless only if it is determined, beyond a reasonable doubt, that the verdict was not affected by the error. *Id.* An error may be harmless if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity or weight and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. *Id.* In determining whether an error was harmless, we consider the alternative evidence presented at trial as well as the character of the inadmissible evidence. *Id.*

■ For the jury to convict the defendant of first-degree murder, the State had to prove, beyond a reasonable doubt, that the defendant purposely caused Wilcox's death. *See* RSA 630:1-a, I(a). At trial, the alternative evidence of the defendant's guilt was overwhelming. The State presented evidence of a motive for the murder: testimony from Eighmey that for weeks, the defendant posed as the victim and negotiated a sale of the victim's brand new Toyota Tacoma. Further, the defendant admitted to the police that he took the title to the Tacoma from the victim's office and

gave it to Eighmey. The State also presented evidence of consciousness of guilt: the defendant attempted to conceal the death by hiding the victim's body in the basement, fleeing to Vermont and assuming his brother's name.

After the defendant was apprehended in Vermont, he admitted to killing the victim. Although the defendant claimed that the homicide was unrelated to the plan to steal the Tacoma, and his defense was that he killed the victim in self-defense, the State presented extensive evidence to the contrary. For example, the defendant alleged that the sexual assault occurred in the living room and that when he awoke to find his penis in the victim's mouth, a struggle ensued. However, the State presented evidence, including photographs and the testimony of a forensic crime scene expert, that there was no bloodshed or struggle in the living room and that the victim was probably face down when most of the wounds were inflicted.

■ Not only was the alternative evidence of guilt extensive, but the inadmissible evidence in this case was merely cumulative. Although Gilbert should not have been permitted to testify that the defendant's reactions were feigned and overdramatic, the entire audio recording of the interrogation was played for the jury. *See Fitzgerald v. Sargent*, 117 N.H. 104, 107 (1977) (finding that improper admission of hearsay evidence was harmless error where the hearsay declarant testified at trial). Regardless of how Gilbert characterized the defendant's emotional responses at trial, the jury could assess the defendant's demeanor from the tape. Although with only an audio recording, the jury could not observe the defendant's physical behavior, they could evaluate his inflection and tone of voice, the volume and speed at which he spoke, and any hesitation in answering questions. Further, even if the inadmissible evidence had been excluded, the jury still would have had before it the admissible portions of Gilbert's testimony, including his statements that the defendant "was able to turn his emotion on and off" and that he did "a lot of . . . eye rolling." *See Kulas*, 145 N.H. at 248-49. We find, therefore, that any error the trial court made in admitting Gilbert's opinion testimony into evidence was harmless beyond a reasonable doubt.

## II

At trial, the defendant sought a jury instruction on self-defense. The self-defense statute, RSA 627:4, II(c), provides in relevant part: "A person is justified in using deadly force upon another person when he reasonably believes that such other person . . . [i]s committing or about to commit kidnapping or a forcible sex offense . . . ." RSA 627:4, II(c) (2007). The defendant requested an instruction that explained the requirements of the statute, but omitted the words "forcible sex offense." The defendant's proposed instruction stated: "A person had the right to use deadly force on

another person to defend himself if . . . [h]e actually believed that the other person was committing or about to commit the crime of aggravated sexual assault by performing fellatio on him."

The State did not dispute that a self-defense instruction was required, but requested language different from that proposed by the defendant. The State's proposed instruction read:

> A person is justified in using deadly force upon another person if he reasonably believed that the other person was committing or about to commit a forcible sex offense against him. It is not enough to constitute self-defense if the defendant merely believed that a non-consensual sexual act was about to be performed on him. In order for the defendant to be justified in using deadly force, he must reasonably believe that he is or was about to be the target of a non-consensual sexual act committed with actual force.

The trial court decided to give an instruction that neither party proposed, but that included the phrase "forcible sex offense." The court explained, "[O]ur statute is clear. The language is not difficult for the jury to understand." The court declined to eliminate the statutory term "forcible" from its instruction because "[f]orcible means something."

The parties then gave closing arguments. In closing, the defendant argued before the jury:

> When someone is having sex with you, sexual penetration while you're sleeping, that is force. To put it bluntly, we all know that any uninvited sexual penetration, such as a mouth on a penis while sleeping, is forcible rape. And to support that, there are over 15 different ways somebody can be convicted of aggravated felonious sexual assault. That's the highest, most serious offense for rape. When an actor overcomes the victim through actual —

The State then objected to defense counsel reading only the section of the aggravated felonious sexual assault (AFSA) statute that describes AFSA by concealment or surprise. The court ruled that the self-defense statute "relies on a finding that the aggressor was committing a forcible sex offense, which [does not] equate[] with the provision of AFSA, concealment or surprise" and sustained the State's objection. In its instructions to the jury, the trial court said:

> A person is justified in using deadly force upon another person if he reasonably believes that the other person is committing or about to commit a forcible sex offense against him. Even if the defendant actually believed that a forcible sex offense is being

committed or is about to be committed, his belief must be reasonable. In other words, there must be reasonable grounds for the defendant to believe Mr. Wilcox was committing or about to commit a forcible sex offense against him when the deadly force was used.

On appeal, the defendant contends that the trial court erred by denying his requested jury instruction and by prohibiting him from referring to the statute in his closing argument. The defendant argues that the phrase "forcible sex offense," as used in the self-defense statute, must be read to encompass RSA 632-A:2, I(i), the provision regarding AFSA by concealment or surprise.

■ The trial court is not required to "use the specific language requested by the defendant." *State v. Johnson*, 157 N.H. 404, 407 (2008). Rather, "the purpose of the trial court's charge is to state and explain to the jury, in clear and intelligible language, the rules of law applicable to the case." *State v. Littlefield*, 152 N.H. 331, 333-34 (2005) (quotation and brackets omitted). Whether a particular jury instruction is necessary, and the scope and wording of that instruction, are within the sound discretion of the trial court. *Johnson*, 157 N.H. at 407. When reviewing jury instructions, we determine whether they adequately and accurately explained the law. *Id.*

The jury instruction at issue raises a question of statutory interpretation, which we review *de novo. Kenison v. Dubois*, 152 N.H. 448, 451 (2005). We interpret statutes in the context of the overall statutory scheme, not in isolation. *Appeal of Union Tel. Co.*, 160 N.H. 309, 317 (2010). We first look to the language of the statute, *Kenison*, 152 N.H. at 451, and construe it "according to the common and approved usage of the language unless from the statute it appears that a different meaning was intended." *N.H. Resident Ltd. Partners of Lyme Timber v. N.H. Dep't of Revenue Admin.*, 162 N.H. 98, 101 (2011) (quotation omitted). We will not consider "what the legislature might have said nor add language that the legislature did not see fit to include." *State v. Lamy*, 158 N.H. 511, 515 (2009).

The defendant argues that the phrase "forcible sex offense do[es] not evoke a single, plain meaning" and urges us to look beyond the language of the self-defense statute. In support of his position, the defendant contends that in light of the extensive reform to rape law in the last fifty years, and the focus in New Hampshire on the violent nature of AFSA, the term "forcible sex offense" must be read to include all variants of AFSA. In other words, the defendant asks us to replace the term "forcible sex offense" in the self-defense statute with the term "aggravated felonious sexual assault." However, the defendant's argument ignores the statutory scheme of the self-defense statute, and instead relies upon the legislative history and

policies behind the AFSA statute. In contrast, the State argues that the term "forcible sex offense" must be construed in the context of the overall scheme of the self-defense statute.

We agree with the State. *See Appeal of Union Tel. Co.*, 160 N.H. at 317. The self-defense statute permits a person to use force, sometimes deadly and sometimes non-deadly, in defending himself from various harms. RSA 627:4 (Supp. 2010). Deadly force is permitted in self-defense against "[a person who] is committing or about to commit . . . a forcible sex offense." RSA 627:4, II(c) (2007). In construing the self-defense statute in the past, we have explained that deadly force is to be "used only when, and to the extent, 'necessary' " and "should not be excessive in relation to the harm threatened." *State v. Warren*, 147 N.H. 567, 569 (2002); *see State v. Etienne*, 163 N.H. 57, 75 (2011).

The legislature could have permitted the use of deadly force against any "aggravated felonious sexual assault" by using that term in the self-defense statute. Indeed, the legislature has used the specific phrase "aggravated felonious sexual assault" in other statutes. For example, in RSA chapter 135-E, the chapter regarding the involuntary civil commitment of sexually violent predators, the legislature specifically explained that the term "sexually violent offense" includes aggravated felonious sexual assault. RSA 135-E:2, XI (Supp. 2010). In RSA chapter 193-D, the statute on safe school zones, the legislature similarly defined the phrase "[a]ct of theft, destruction, or violence" to include "[a]ny . . . aggravated felonious sexual assault under RSA 632-A." RSA 193-D:1, I(c) (2007). However, in the self-defense statute, the legislature used the term "forcible sex offense" instead. The legislature has thrice amended the self-defense statute since the enactment of the AFSA statute, *see* Laws 1981, 347:1, :2 (effective Aug. 16, 1981); Laws 2010, 361:1 (effective Jan. 1, 2011); Laws 2011, 268:1 (effective Nov. 13, 2011), yet did not replace the term "forcible sex offense" with the term "aggravated felonious sexual assault."

To construe the term "forcible sex offense" to mean any AFSA, as the defendant asks us to, would render the word "forcible" as used in the self-defense statute meaningless, and would require us to insert language the legislature did not see fit to include. It would also lead to the illogical result that a person could use deadly force to defend against any non-consensual sex act, but in all other circumstances, could only use deadly force to the extent necessary, and proportionate with, the harm threatened. *See Warren*, 147 N.H. at 569. Such a result is contrary to the rest of the statutory scheme and we decline to adopt such an unreasonable interpre-

tation. *Petition of Poulicakos*, 160 N.H. 438, 444 (2010) ("[a]s between a reasonable and unreasonable meaning of the language used, the reasonable meaning is to be adopted").

 We agree with the trial court that the term "forcible" means something. However, in light of the plain language of the statute and the overall statutory scheme, we need not set forth a technical meaning for the term "forcible." *See State v. Dominguez*, 128 N.H. 288, 289 (1986) ("the judge has no duty to explain non-technical terms or phrases that are readily comprehended"). In RSA 627:9, the legislature specifically defined the terms "deadly force" and "non-deadly force." *See* RSA 627:9, II, IV (2007). It could have given the term "forcible sex offense" a technical legal definition, but chose not to. We assume the legislature intended the ordinary meaning of the term "forcible" to apply. *See N.H. Resident Ltd. Partners of Lyme Timber*, 162 N.H. at 101; *Tovar v. State*, 165 S.W.3d 785, 790 (Tex. App. Ct. 2005) ("Words that are not statutorily defined are to be given their common, ordinary, or usual meaning."). The defendant concedes that the term "forcible" is commonly understood to mean "effected by force used against opposition or resistance: obtained by compulsion or violence." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 888 (unabridged ed. 2002). He points out, however, that the noun "force" has a number of definitions. Despite these multiple definitions, the ordinary meaning of the word is unambiguous because each definition has in common the use of some amount of "strength" or "power." *See Johnson v. United States*, 130 S. Ct. 1265, 1270 (2010) (finding that although the word force "has a number of meanings," its "ordinary meaning refers to the application of strength [and] power").

 The trial court is not required to define commonly understood terms to the jury. *Dominguez*, 128 N.H. at 289; *see also State v. Hoffer*, 383 N.W.2d 543, 548-49 (Iowa 1986) (holding that jury instructions need not define terms unless they have a technical legal meaning as distinguished from their ordinary meaning). In this case, the trial court properly explained the law of self-defense and used the exact language of the statute. The trial court was not required to further define the term "forcible sex offense" because the phrase has a commonly understood ordinary meaning, rather than a technical legal meaning. *Dominguez*, 128 N.H. at 289; *see also People v. Powell*, 716 P.2d 1096, 1100 (Colo. 1986) ("Where . . . a jury properly is instructed that force is an element of the crime . . . , there is no reason to require a further instruction on the commonly-used word 'force.'"). We hold that the trial court's instruction to the jury was proper.

■ For the reasons discussed above, we also find that the trial court did not err by prohibiting the defense from referring to the aggravated felonious sexual assault statute in its closing argument.

*Affirmed.*

DALIANIS, C.J., and HICKS, CONBOY and LYNN, JJ., concurred.