Merrimack
No. 2011-414

THE STATE OF NEW HAMPSHIRE

v.

KEVIN GUAY

Argued: November 27, 2012
Opinion Issued: March 20, 2013

*Michael A. Delaney*, attorney general (*Lauren J. Noether*, senior assistant attorney general, on the brief and orally), for the State.

*Dorothy E. Graham*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

HICKS, J. The defendant, Kevin Guay, appeals his convictions in Superior Court (*Bornstein*, J.) for two counts of unlawful operation of a solid waste facility, RSA 149-M:9, I, :15, III (2005), and one count of unlawful maintenance of a subsurface septic system, RSA 485-A:37 (2001). We affirm.

I

The following facts are undisputed. At all times relevant to this appeal, the defendant, a land developer and operator of a junk removal business, owned property at 180 Clinton Street and 30 Villanova Drive in Concord. Among those working for the defendant was Paul Vera, who lived in the basement of 180 Clinton Street.

In February 2009, Vera contacted Detective Sean Ford of the Concord Police Department to report hazardous materials buried at 30 Villanova Drive and septic system violations at 180 Clinton Street. After an investigation, and in collaboration with investigators from the New Hampshire Department of Environmental Services (DES), Ford obtained search warrants for both properties. At 30 Villanova Drive, the authorities unearthed, among other items, a 275-gallon home heating oil tank, carpeting, old mattresses, foam insulation, a metal stove, shingles, wiring, a hot tub broken into pieces, and paint cans. At 180 Clinton Street, they found both above-ground items — including mattresses, appliances, chairs, couches, ceiling tiles, a snowmobile, an oil tank, metal debris, and insulation, the majority of which had been exposed to the elements and was not in usable condition — and buried items — including sheet rock and tree stumps.

During the search of 180 Clinton Street, a DES investigator, who is also an expert in subsurface systems compliance, observed liquid on top of the defendant's septic system and a garden hose attached to a sump pump that channeled untreated brown water from the septic tank, bypassing the leach field and discharging liquid in the direction of the Turkey River. The investigator tested samples of the liquid in the hose and the soil beyond it and found fecal contamination.

Based upon this and other evidence, the State charged the defendant with three misdemeanors: (1) unlawful operation of a solid waste facility at 30 Villanova Drive; (2) unlawful operation of a solid waste facility at 180 Clinton Street; and (3) unlawful maintenance of a subsurface septic system at 180 Clinton Street. After a week-long trial, the jury convicted him on all counts.

II

On appeal, the defendant first argues that RSA 485-A:37 does not allow the State to charge him with a misdemeanor because the exclusive penalty

for a violation of that provision is civil forfeiture in accordance with RSA 485-A:43, IV (2001). Resolving this issue requires us to interpret RSA 485-A:37 and the penalty provisions of RSA 485-A:43, I (2001) and IV. We are the final arbiter of the legislature's intent regarding the meaning of a statute considered as a whole, and our review of the trial court's statutory interpretation is *de novo. Ouellette v. Town of Kingston*, 157 N.H. 604, 609 (2008). We first examine the language of the statute, and, where possible, we ascribe the plain and ordinary meanings to the words used. *Id.* When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we refuse to consider what the legislature might have said or add language that the legislature did not see fit to incorporate in the statute. *Id.* Finally, we interpret a statute in the context of the overall statutory scheme and not in isolation. *State v. Etienne*, 163 N.H. 57, 72 (2011).

RSA 485-A:37 provides:

> Any person who has installed or otherwise acquired a subsurface sewage or waste disposal system installed in accordance with the provisions of this subdivision is required to operate and maintain said system in such a manner as to prevent a nuisance or potential health hazard due to failure of the system. Failure to so operate and maintain shall be considered a violation of this chapter and shall be subject to the penalty as provided in RSA 485-A:43, IV.

RSA 485-A:43, IV, in turn, states:

> Any person neglecting or refusing to comply with the provisions of RSA 485-A:37 shall be subject to a civil forfeiture not to exceed $1,000 for each day of neglect or refusal after notice as provided for in RSA 485-A:37.

Based upon his alleged unlawful maintenance of a septic system under RSA 485-A:37, the defendant was charged with and convicted of a misdemeanor pursuant to RSA 485-A:43, I:

> Any person who shall violate any of the provisions of this subdivision or who shall knowingly fail, neglect or refuse to obey any order of the department or member or authorized agent of the department issued under the authority of this subdivision . . . shall be guilty of a misdemeanor if a natural person, or guilty of a felony if any other person.

On appeal, the defendant contends that "[t]he plain language of RSA 485-A:37 specifies that a violation is subject to the penalty provided in RSA

485-A:43, IV," and that "[n]othing in the plain language of the statute allows for any additional penalty beyond that stated in RSA 485-A:43, IV." The State, on the other hand, contends that a violation of RSA 485-A:37 is a misdemeanor under RSA 485-A:43, I, and may also subject the violator to civil forfeiture under RSA 485-A:43, IV.

 The language of RSA 485-A:37, if read in isolation, might support the defendant's contention that the exclusive penalty for failing to operate and maintain a sewage disposal system so as to prevent a nuisance or potential health hazard is civil forfeiture under RSA 485-A:43, IV. We do not interpret statutes in isolation, however, but "in the context of the overall statutory scheme." *Etienne*, 163 N.H. at 72 (quotation omitted). "Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme." *Id.* (quotation omitted). Viewing the statute in the context of the overall statutory scheme and purpose, we agree with the State's interpretation that violations of RSA 485-A:37 may be subject to both criminal and civil penalties.

As an initial matter, unlike RSA 485-A:43, I, which provides simply that any person who "shall violate" any provision of the sewage disposal systems subdivision is guilty of a misdemeanor, RSA 485-A:43, IV subjects a person to civil forfeiture for "neglecting or refusing" to comply with RSA 485-A:37. The fine for such "neglect or refusal" is to be levied "for each day of neglect or refusal after notice as provided for in RSA 485-A:37" — *i.e.*, after DES issues a "compliance order[] in writing," RSA 485-A:37. Thus, in contrast to the civil forfeiture penalty of RSA 485-A:43, IV, which is conditioned upon the initiation of State action, the misdemeanor provision of RSA 485-A:43, I, is triggered whenever there has been any "violat[ion]" of the sewage disposal systems subdivision. As a result, the defendant's interpretation of the statute would mean that as long as DES does not issue a written compliance order, for whatever reason, a person is at liberty to allow his or her sewage system to create a nuisance or potential health hazard with impunity. Such an interpretation is plainly inconsistent with the statute's express purpose "to protect water supplies, to prevent pollution in the surface and groundwaters of the state and to prevent nuisances and potential health hazards." RSA 485-A:1 (2001); *see Etienne*, 163 N.H. at 72. We do not believe the legislature intended to make a public health risk as serious as the failure to "operate and maintain [a sewage] system in such a manner as to prevent a nuisance or potential health hazard," RSA 485-A:37, punishable only after DES learns about a violation and issues a written compliance order to enjoin or remedy it. Indeed, it makes eminent sense that the legislature would enact both a general criminal deterrent to the

"failure to so operate and maintain" one's septic system in a manner as to prevent a "nuisance or potential health hazard," RSA 485-A:37, as well as a civil administrative penalty designed to compel prompt remedial action.

 Furthermore, the statute's reference to "a violation of this chapter" in RSA 485-A:37 would be rendered superfluous were we to conclude that civil forfeiture under RSA 485-A:43, IV is the exclusive penalty for RSA 485-A:37 violations. *See Pennelli v. Town of Pelham*, 148 N.H. 365, 367-80 (2002) ("Basic statutory construction rules require that all of the words of a statute must be given effect and that the legislature is presumed not to have used superfluous or redundant words." (quotation omitted)). Had the legislature intended as much, it could have simply omitted that clause, resulting in a provision reading, "Failure to so operate and maintain shall be subject to the penalty as provided in RSA 485-A:43, IV." That the misdemeanor provision of RSA 485-A:43, I, specifically provides that it applies to any person who "shall violate" the sewage disposal systems subdivision leads to the conclusion that non-compliance with RSA 485-A:37 — expressly labeled "a violation" in that provision — subjects the violator to misdemeanor prosecution.

 The defendant also cites *State v. Bell*, 125 N.H. 425, 432 (1984), for the proposition that "where one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, the latter will be regarded as an exception to the general enactment where the two conflict." There is no conflict, however, between a provision stating that violations of the sewage disposal systems subdivision are considered *criminal* acts, *see* RSA 485-A:43, I, and a provision stating that a person may be subject to a *civil* fine for each day of noncompliance with a written DES order, *see* RSA 485-A:43, IV.

## III

The defendant next argues that he is entitled to a new trial under the plain error doctrine because certain "[i]nadmissible evidence concerning witness credibility was presented at trial and discussed in closing argument." He rests this argument upon the cumulative effect of three asserted improprieties during his trial, to which he did not object: (1) Detective Ford commented upon Guay's credibility in his testimony; (2) the prosecutor questioned the defendant about the credibility of other witnesses; and (3) in her closing argument, the prosecutor discussed the defendant's answers about the credibility of other witnesses. We briefly discuss these exchanges before turning to the merits of the defendant's assertion of plain error.

The first asserted impropriety involved testimony of Detective Ford that suggested the defendant did not provide credible answers during the police

investigation. Ford testified that, after serving the defendant with a search warrant, he asked him about "the septic problem." Ford testified that the defendant "said that he was coincidentally in negotiations right now with several septic companies to . . . come and fix the problem." Ford used the word "coincidentally" on two other occasions when referring to the defendant's actions, thereby, the defendant suggests, implying that the defendant's behavior was unworthy of belief. Ford also described the defendant as "shifty" on one occasion.

The second asserted impropriety involved questioning pursued by the prosecutor on cross-examination of the defendant that required the defendant to opine as to the credibility of other witnesses. For example, the prosecutor asked the defendant if he "told Detective Ford that you were the one . . . who hooked up the septic to the sump pump and pumped it." After the defendant denied having said this, the prosecutor said, "So you're saying . . . Ford lied when he said that?" The defendant said, "If he said that, he did."

The prosecutor then asked the defendant to opine as to whether Robert Phillips, a contractor hired by the defendant to help dig a cellar hole at the Villanova property, among other tasks, had testified truthfully:

Q. And you heard Mr. Phillips say that he ran into a propane tank when he was doing the cellar hole on that property.

A. Correct.

Q. He said he ran into all kinds of trash. Did you hear him say that?

A. I don't know if he referred to "all kinds," but yes he did, he said he ran into trash.

Q. And that the next day it would be covered again, and it was hard to work on the site as a result.

A. Correct.

Q. Is he lying about that?

A. Absolutely.

Later in the cross-examination, the prosecutor pursued a similar line of questioning:

Q. You . . . were supposed to cover that leech [*sic*] field at 180 Clinton Street yourself. Is that correct?

A. No. Bob Phillips was to cover the leech [*sic*] field. That was part of the agreement.

Q. You heard him testify that you wanted to do it yourself to save money.

A. That was incorrect.

Q. So he lied about that, as well.

A. Correct.

The prosecutor also asked the defendant to comment on the credibility of Edward Tucker, a witness for the defense.

The third and final asserted impropriety involved the State's closing argument, in which the prosecutor referred to the defendant's answers to the prosecutor's questions about the credibility of other witnesses:

Is [Vera] in cahoots with Craig Walker? Is it all a giant conspiracy, because from what [the defendant] testified to, everybody but he, essentially, is a liar. Mr. Phillips is a liar, Paul Vera is a liar, Detective Ford is a liar, Carl Woodbury is a liar at points, and Ed Tucker, his own witness, he said lied about some things.

He's the only one who doesn't lie here.

At the outset, we find no impropriety in Detective Ford's use of the word "coincidentally." Although the defendant asserts that Ford's use of that term amounts to an "impermissible comment on [the defendant]'s credibility," an equally plausible reading of the transcript is that Ford was simply repeating what the defendant told him — *i.e.*, that it was a coincidence he was being investigated just as he was in the process of fixing the problems. The jury would not have been compelled to accept the interpretation advanced by the defendant on appeal. As to Ford's use of the word "shifty," we assume, without deciding, that a timely objection to this testimony should have been sustained, and accordingly review it for plain error.

Under the plain error rule, we may consider errors not raised before the trial court. *State v. Russell*, 159 N.H. 475, 489 (2009). "A plain error that affects substantial rights may be considered even though it was not brought

to the attention of the trial court or the supreme court." SUP. CT. R. 16-A. However, the rule should be used sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result. *Russell*, 159 N.H. at 489. Our plain error rule requires: (1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity, or public reputation of the judicial proceedings. *State v. Lopez*, 156 N.H. 416, 423 (2007).

■ The State concedes that, as a consequence of our holding in *Lopez*, the defendant has met his burden to satisfy the first two prongs of the plain error test with respect to the second and third improprieties. In that case, we adopted "a broad prohibition on questions requiring a witness to comment upon the credibility of other witnesses," as the prosecutor's questions of the defendant in this case did. *Id.* at 424. More recently, in *State v. Souksamrane*, 164 N.H. 425 (2012), we examined a similar line of questioning and used the "opportunity to condemn, as forcefully as possible, prosecutorial cross-examination that compels a defendant to state that the police or other witnesses lied in their testimony." *Souksamrane*, 164 N.H. at 428 (quotation omitted).

■ Although these exchanges constituted error that "was or should have been obvious in the sense that the governing law was clearly settled to the contrary," *Lopez*, 156 N.H. at 424 (quotations omitted), they do not amount to plain error under the third prong of that test. To meet the third prong of the plain error test, the error must affect substantial rights. *State v. Taylor*, 152 N.H. 719, 720 (2005). Generally, to satisfy the burden of demonstrating that an error affected substantial rights, the defendant must show that the error was prejudicial, *i.e.*, that it affected the outcome of the proceeding. *Lopez*, 156 N.H. at 425.

■ The defendant argues that the *Lopez* errors "relieved the jury of its duty to determine witness credibility." The trial judge properly instructed the jurors, however, that their duty was to judge the credibility of witnesses, stating, among other things, "it is up to you to decide who to believe"; "you must . . . decide what the truth is"; and "you should consider the testimony of each witness and give it the weight that you think it deserves." We presume that the jury followed these instructions. *State v. Smith*, 149 N.H. 693, 697 (2003).

■ The defendant further contends that he was prejudiced in two ways: (1) Ford's testimony "communicated to the jury that [the defendant] was not worthy of its belief"; and (2) "the State used [the defendant]'s testimony to paint him as a conspiracy theorist . . . and that his version was

implausible." However, in contrast to the undisputed *Lopez* errors and Ford's reference to the defendant as "shifty," the evidence of the defendant's guilt in this case was overwhelming. This evidence included eighteen witnesses for the State and 172 exhibits, supporting the State's allegations that the defendant operated a junk removal business and stored junk, without a permit, at both 180 Clinton Street and 30 Villanova Drive. Many witnesses, including the defendant's employee Paul Vera, his friend Allan Evans, his subcontractor Robert Phillips, and several others, offered testimony confirming the substance of the charges. When the police and DES investigators executed search warrants in March 2009, they discovered large quantities of buried and above-ground waste at both 30 Villanova Drive and 180 Clinton Street. The State also produced an overwhelming amount of evidence to support the charge of failing to maintain a septic system in a manner as to prevent a nuisance or potential health hazard. Vera testified, for example, that he helped the defendant fix the broken septic pump by, first, digging a trench to allow the "brown water" to drain onto Clinton Street, and, second, when that plan created an odor, installing a submergible pump attached to a garden hose that was directed towards the Turkey River, where the effluent was discharged. The DES investigator testified that the defendant's system bypassed the leach field and discharged in the direction of the river. The investigator tested the soil and liquid in the area, including on the bank of the river itself, and discovered E. coli, a product of fecal pollution. When asked whether he or Vera configured the septic system in this manner, the defendant told Detective Ford, "[I]t was me, just put me down, I'm the guy." Further, numerous photographs were offered into evidence showing the septic system's unlawful operation. In light of this and other evidence, the defendant has not met his burden to demonstrate that the errors affected the outcome of the case.

*Affirmed.*

DALIANIS, C.J., and CONBOY, LYNN and BASSETT, JJ., concurred.