NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Hillsborough - northern judicial district
No. 2013-079


THE STATE OF NEW HAMPSHIRE

v.

MYLES WEBSTER

Argued:  September 11, 2014
Opinion Issued:  October 15, 2014


Joseph A. Foster, attorney general (Stacey L. Pawlik, assistant attorney general, on the brief and orally), for the State.

David M. Rothstein, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

DALIANIS, C.J.  The defendant, Myles Webster, appeals his conviction by a jury of attempted murder, see RSA 629:1 (2007); RSA 630:1 (Supp. 2013); armed robbery, see RSA 636:1 (2007); reckless conduct, see RSA 631:3 (2007); and resisting arrest, see RSA 642:2 (Supp. 2013).  On appeal, he argues that the Superior Court (Abramson, J.) erred by denying his motions to suppress eyewitness identification evidence and for a change of venue.  We affirm.

I. Motion to Suppress

    A. Background

       The trial court found, or the record establishes, the following facts. On March 21, 2012, Manchester Police Officer Daniel Doherty responded to a request for assistance in detaining a subject. Doherty saw the subject walking on Dubuque Street. He exited his cruiser and walked toward the subject. The subject was about thirty feet away from Doherty, and Doherty testified that he clearly saw the subject's face. The suspect started running when Doherty yelled, "Police, show me your hands!" Doherty pursued the subject on foot and then radioed for assistance.

       The two ran across Dubuque Street to Wayne Street. After Doherty got within three-to-five feet of the subject, the subject pulled a gun out of his waistband and shot Doherty. Doherty fell backward. While lying on his back, Doherty returned fire. The subject repeatedly shot Doherty, moving closer to Doherty as he did so. When the shooting stopped, the subject was only two or three feet away from Doherty, who testified that he could clearly see the subject's face. The subject then ran away.

       Kimberly Edwards was on the porch of her Wayne Street apartment when the shooting occurred. She heard people running and saw an officer chasing someone. She saw that person then "whip[ ] around" and raise a black handgun. She ran inside and heard many shots. After the shots subsided, she returned outside and observed an officer lying on the ground. Edwards testified that she clearly saw the shooter because she was only about twenty feet away from him.

       Holly Martin was sitting in her car, which was parked near the intersection of Wayne and Rimmon Streets, when she observed a police officer chasing a man toward her vehicle. For a few seconds, she was able to see the man being chased and observed him raise a gun toward the officer.

       The defendant was apprehended that evening, and at 4:44 a.m. on March 22, the police released his booking photograph to the media. Later that day, the police spoke with Edwards and Martin. Edwards told the police that, in a newspaper article and on the internet, she saw photographs of a man whom she believed she had seen shoot an officer the day before on March 21. Martin called the police on the night of the incident to tell them what she had witnessed. Approximately two weeks later, she was asked to give a recorded statement. Martin mentioned to the police that she had seen a photograph of the subject in a newspaper. Doherty was interviewed about the incident in April, and, at that time, told the police that he had seen on television photographs of the man who shot him.

2

Before trial, the defendant moved to suppress the out-of-court identifications made by Doherty, Edwards, and Martin. He argued that the Manchester Police Department procured those out-of-court identifications by using an unnecessarily suggestive identification procedure that entailed releasing his booking photograph before interviewing the witnesses and without first using non-suggestive identification procedures. The defendant also sought to preclude these witnesses from identifying him in court during trial, arguing that such identifications would have been irreparably tainted by the unnecessarily suggestive out-of-court identifications.

Additionally, the defendant sought to preclude initial in-court identifications made by other eyewitnesses, arguing that their in-court identifications would be "unreliable because they were not asked to identify [him] in a photo array or lineup" and because "their memories [were] affected by the pervasive media coverage." The defendant argued that the admission into evidence of these out-of-court and in-court identifications violated his state and federal constitutional rights to due process. See N.H. CONST. pt. I, art. 15; U.S. CONST. amends. V, XIV.

The trial court held two hearings on the defendant's motion to suppress. In its order following the first hearing, the trial court ruled that the out-of-court identifications by Doherty, Edwards, and Martin "were arranged by law enforcement and were procured under unnecessarily suggestive circumstances." The court found that the police released the defendant's booking photo "in a press release at 4:44 a.m. on March 22, 2012," which was "mere hours before [the] defendant's public arraignment." The court credited the testimony of a police sergeant that the photograph was released in response to media inquiries and in accordance with normal department policy. The court found that Doherty, Edwards, and Martin all "identified [the] defendant as the shooter by referencing the photographs in the media, including [his] booking photograph." The court further found that "given the circumstances surrounding this case," including "the extensive media coverage, the fact that witnesses had yet to identify [the] defendant, and the fact that [the police department] released the photograph mere hours before [his] public arraignment," the police acted improperly by releasing the photograph. Based upon the above findings, the trial court determined that the identification procedure was unnecessarily suggestive.

In its order following the second hearing, the court evaluated the out-of-court identifications by Doherty, Edwards, and Martin and found them to be reliable and admissible according to the factors enumerated in Neil v. Biggers, 409 U.S. 188 (1972). See id. at 199-200 (listing, among the "factors to be considered in evaluating the likelihood of misidentification," the witness' opportunity "to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the

3

level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation"). Having so concluded, the court determined that it had "no need to separately examine the propriety of any in-court identification" made by those witnesses. The court also ruled that the Biggers factors did not apply to the in-court identifications of other witnesses. See State v. King, 156 N.H. 371, 376 (2007); see also State v. Perry, 166 N.H. ___, ___ (decided September 12, 2014). The court, therefore, denied the defendant's motion to suppress.

B.  Analysis

The defendant first contends that the court erroneously found that the out-of-court identifications by Doherty, Edwards, and Martin were admissible because it misapplied the Biggers factors. Second, he asserts that the court erred by declining to apply the Biggers factors to the in-court identifications made by witnesses who had not previously identified the defendant to the police. The admission of the out-of-court and in-court identifications, he argues, violated the State and Federal Due Process Clauses. See N.H. CONST. pt. I, art. 15; U.S. CONST. amends. V, XIV. The State argues, among other things, that the trial court erred when it determined that the police used an unnecessarily suggestive identification procedure.

We first address the defendant's claims under the State Constitution and rely upon federal law only to aid our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983). "On appeal from a motion to suppress identification evidence, we will not overturn the trial court's ruling unless, after reviewing the record, we conclude that it is contrary to the weight of the evidence." State v. Perri, 164 N.H. 400, 404 (2012). In making this determination, we ask whether the identification procedures used were so unnecessarily suggestive and conducive to irreparable mistaken identification that the defendant was denied due process of law. Id. The defendant has the initial burden of proving that the identification procedure was unnecessarily suggestive. Id. Only if the defendant has met this burden must we then consider the Biggers factors to determine whether the identification procedure was so suggestive as to render the identification unreliable and, hence, inadmissible. Id.

1.  Out-of-Court Identifications

We first consider whether, as the State contends, the trial court erred by analyzing the out-of-court examinations under the Biggers factors because, contrary to the trial court's finding, those identifications were not the result of an unnecessarily suggestive identification procedure. See State v. Dion, 164 N.H. 544, 552 (2013) ("Where the trial court reaches the correct result on mistaken grounds, we will affirm if valid alternative grounds support the decision." (quotation and brackets omitted)).

4

In <u>Perry v. New Hampshire</u>, 132 S. Ct. 716 (2012), the United States Supreme Court rejected the contention that its identification decisions "support[ ] a rule requiring trial judges to prescreen eyewitness evidence for reliability any time an identification is made under suggestive circumstances." <u>Perry</u>, 132 S. Ct. at 725. It held that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances <u>arranged by law enforcement</u>." <u>Id</u>. at 730 (emphasis added). "The fallibility of eyewitness evidence does not, without the taint of <u>improper state conduct</u>, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." <u>Id</u>. at 728 (emphasis added); <u>see</u> <u>also</u> <u>State v. Addison</u>, 160 N.H. 792, 801-02 (2010) (holding that the <u>Biggers</u> analysis does not apply to either in-court or out-of-court identification in the absence of improper state action).

In <u>Perry</u>, the Court explained:

> Most eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do. Out-of-court identifications volunteered by witnesses are also likely to involve suggestive circumstances. For example, suppose a witness identifies the defendant to police officers after seeing a photograph of the defendant in the press captioned "theft suspect," or hearing a radio report implicating the defendant in the crime. Or suppose the witness knew that the defendant ran with the wrong crowd and saw him on the day and in the vicinity of the crime. Any of these circumstances might have "suggested" to the witness that the defendant was the person the witness observed committing the crime.

<u>Perry</u>, 132 S. Ct. at 727-28. Suggestive circumstances such as those do not trigger a <u>Biggers</u> analysis because they were not created by <u>improper</u> police conduct. <u>See</u> <u>id</u>. at 724-28.

Here, we conclude that the release of the defendant's booking photograph did not constitute an unnecessarily suggestive identification procedure. The eyewitnesses, Doherty, Edwards, and Martin, "of [their] own accord," saw the defendant's booking photograph. <u>Bell v. State</u>, Nos. 03-11-00247-CR, 03-11-00248-CR, 03-11-00249-CR, 03-11-00250-CR, 03-11-00251-CR, 2012 WL 3797597, at *8 (Tex. Crim. App. Aug. 28, 2012). Even if we assume that releasing the booking photograph was improper, "this is not a case involving state action as contemplated by <u>Biggers</u>." <u>Id</u>. As one court has explained, "A witness'[s] viewing of a suspect's photograph through the media does not ordinarily constitute an impermissibly suggestive identification procedure" because the viewing itself "is not engineered by [the] prosecution or law

5

enforcement agencies." O'Connell v. State, 742 N.E.2d 943, 948 (Ind. 2001). Although law enforcement may have disseminated the photograph to the media, absent evidence that law enforcement also orchestrated the viewing of that photograph by a witness, there is no state action within the meaning of Biggers. See State v. Kennedy, No. 1 CA-CR 06-0556, 2007 WL 5209493, at *2 (Ariz. Ct. App. Oct. 18, 2007) (concluding that police release of photograph was not "state action" when State "was not responsible for the media coverage of Defendant's arrest" and did not "arrange for or encourage the victim's serendipitous viewing of [his] picture on television"); State v. Miramon, No. 2 CA-CR 2005-0335, 2007 WL 5578361 (Ariz. Ct. App. Sept. 21, 2007), at *4 (newscast showing "mug shot" photograph of defendant was not state action within meaning of Biggers, even though photograph had been disseminated to media outlets by police).

Therefore, we hold that the trial court erred when it determined that releasing the defendant's booking photograph constituted state action within the meaning of Biggers. Accordingly, the trial court also erred when it subjected the out-of-court identifications made by Doherty, Edwards, and Martin to the Biggers test. In light of our decision, we need not consider the defendant's argument that the trial court misapplied the Biggers factors. Because the Federal Constitution is no more protective of the defendant's rights than the State Constitution under these circumstances, see Perry, 132 S. Ct. at 724-28, we reach the same conclusion under the Federal Constitution.

Because the out-of-court identifications were not the result of an impermissibly suggestive identification procedure, "it suffice[d] to test [their] reliability through the rights and opportunities generally designed for that purpose, notably . . . vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proven beyond a reasonable doubt." Id. at 721. Indeed, many of the safeguards identified in Perry were used in this case. The defendant vigorously cross-examined Doherty, Edwards, and Martin about their out-of-court identifications. Moreover, as requested by the defendant, the court gave the jury a lengthy instruction on the fallibility of eyewitness identification evidence. In addition, the court instructed the jury several times that the State had the burden of proving the defendant's guilt beyond a reasonable doubt. Accordingly, notwithstanding the reasons given by the trial court for its admission of the evidence of the out-of-court identifications, we affirm its ruling.

### 2. In-Court Identifications

We next determine whether, as the defendant contends, the trial court erred when it declined to apply the Biggers factors to the in-court identifications made by witnesses who had not previously made out-of-court

6

identifications.  The trial court relied upon our decision in King, 156 N.H. at 376, when it found the Biggers analysis inapplicable to the in-court identifications.  In King, we addressed whether the "two-step [Biggers] analysis applies to a strictly in-court identification not preceded by an impermissibly suggestive pretrial confrontation."  King, 156 N.H. at 374.  "Based upon the different considerations involved in pretrial and in-court identifications, we join[ed] the apparent majority of courts in concluding that Neil v. Biggers does not apply to in-court identifications and that the remedy for any alleged suggestiveness of an in-court identification is cross-examination and argument."  Id. at 376 (quotation omitted).  We concluded that "[t]he inherent suggestiveness in the normal trial procedure . . . does not rise to the level of constitutional concern."  Id.  Accordingly, consistent with King, we hold that the trial court did not err in admitting the in-court identification without first testing its reliability under the Biggers factors.  See id.; see also Perry, 166 N.H. at ___.

The defendant argues that King is distinguishable from this case because the witness in King was presented, before trial, with a "non-suggestive lineup." We rejected a nearly identical argument in Perry, 166 N.H. at ____, explaining that a defendant does not have the right to a non-suggestive pretrial identification procedure before identifying a defendant in court.  See id.; see also King, 156 N.H. at 376.  Alternatively, the defendant, like the defendant in Perry, invites us to overrule King.  See Perry, 166 N.H. at ___.   We decline his invitation for the same reasons that we declined the defendant's invitation in Perry.  See id.

II.  Motion for Change of Venue

A.  Background

The record establishes the following facts.  Before trial, the defendant filed a motion requesting that his counsel be allowed "to individually voir dire the potential jurors" and "to peremptorily challenge up to 15 juror[s]," see RSA 606:3 (2001).  The State partially objected, arguing that special jury-selection procedures were not warranted, but stating that it did not object to "a hybrid form of voir dire, which would permit some individual questioning by the attorneys in this case."  Following a hearing, the court granted the defendant's motion in part, ordering that the attorneys would be allowed to question prospective jurors, but not outside the presence of other prospective jurors. The court denied the defendant's request for additional peremptory challenges, deciding that, as set forth in RSA 606:3, he was entitled to no more than three peremptory challenges.

Also before trial, over the State's objection, the defendant moved for a change of venue, arguing that a change was required because the crime with

7

which he was charged – shooting a Manchester police officer – "set in motion a wave of public passion, outcry, and outrage in the community in which the prospective venire resides" and that "inflammatory" media coverage had tainted the jury pool. Following a hearing on that motion, the court determined that the defendant failed to prove that he could not receive a fair and impartial jury absent a change of venue. After reviewing the media compilation submitted by the defendant, the court concluded that "the overwhelming bulk of the material submitted consists of straightforward, unemotional factual accounts of events and of the progress of investigations." (Quotation omitted.) The court further found that "the media coverage surrounding this case was most extensive immediately after the shooting in March 2012 and has diminished substantially since that time." Although the defendant contended that, because the victim was a police officer, he had "a much more personal connection to the citizenry of Manchester," the court observed that the defendant "failed to submit any evidence" to support that claim. Finally, the court rejected the defendant's assertion that the information revealed in the pretrial publicity, including facts about his criminal background, was inherently prejudicial.

### B. Analysis

The defendant contends that the trial court's denial of his motion to change venue, preceded by the denials of his motion for attorney-conducted, individual juror voir dire and/or additional peremptory challenges, violated his state and federal constitutional rights to due process and a fair and impartial jury and entitles him to a new trial. See N.H. CONST. pt. I, arts. 15, 17, 35; U.S. CONST. amends. V, VI, XIV.

"It is well established that due process requires that an accused must receive a trial by a fair and impartial jury." State v. Addison (Capital Murder), 165 N.H. 381, 425 (2013) (quotation omitted). Part I, Article 17 of the New Hampshire Constitution provides:

> In criminal prosecutions, the trial of facts, in the vicinity where they happened, is so essential to the security of the life, liberty and estate of the citizen, that no crime or offense ought to be tried in any other county or judicial district than that in which it is committed; except in any case in any particular county or judicial district, upon motion by the defendant, and after a finding by the court that a fair and impartial trial cannot be had where the offense may be committed, the court shall direct the trial to a county or judicial district in which a fair and impartial trial can be obtained.

N.H. CONST. pt. I, art. 17; see N.H. CONST. pt. I, art. 35 ("It is the right of

8

every citizen to be tried by judges as impartial as the lot of humanity will admit"); see also U.S. CONST. amend VI. As we have explained, "Part I, Article 17 grants a criminal defendant two rights: the right to be tried where the crime was committed and the right to obtain a change of venue upon proof that he cannot obtain a fair trial there." Addison, 165 N.H. at 426 (quotation omitted). Accordingly, "upon proof that a fair trial cannot be had in the place of proper venue, the defendant has an absolute right to a change of venue." Id. (quotation omitted). "In this way[,] Part I, Article 17 provides the same level of protection as the Federal Constitution." Id. (quotation and ellipses omitted).

We first address the defendant's claim under the State Constitution and rely upon federal law only to aid our analysis. See Ball, 124 N.H. at 231-33. Publicity about a case can result in two types of prejudice with regard to the accused's right to a fair trial: inherent prejudice and actual prejudice. Addison, 165 N.H. at 426-27. Here, the defendant argues only the former.

Inherent prejudice "exists when the publicity by its nature has so tainted the trial atmosphere that it will necessarily result in lack of due process. In such cases the defendant need not show actual identifiable prejudice." Id. at 427 (quotation omitted). The defendant asserts that in light of the trial court's denials of his requests for attorney-conducted, individual juror voir dire and/or additional peremptory challenges, "[t]he jury selection process he received" was insufficient to ensure an unbiased jury "despite the publicity about the case."

"A trial court's determination of the impartiality of the selected jurors is entitled to special deference." Id. (quotation omitted). "Particularly with respect to pretrial publicity[,] primary reliance on the judgment of the trial court makes good sense." Id. (quotation and ellipsis omitted). "The judge of that court sits in the locale where the publicity is said to have had its effect, and brings to his evaluation of any such claim of prejudice his own perception of the depth and extent of news stories that might influence a juror." Id. (quotation omitted). Accordingly, we will not reverse the trial court's decision unless it amounts to manifest error. Id.

"Prejudice may properly be presumed where prejudicial, inflammatory publicity about a case so saturated the community from which the defendant's jury was drawn as to render it virtually impossible to obtain an impartial jury." Id. (quotation and brackets omitted). "A presumption of prejudice because of adverse publicity attends only the extreme case." Id. (quotation omitted). "[I]t is the adverse nature of the publicity, not merely its quantity, that is critical in finding presumptive prejudice." Id. at 428 (quotation omitted).

We have never found inherent prejudice in a case such that a change of venue was compelled. Id. For instance, the defendant in Addison was charged with the capital murder of Manchester Police Officer Michael Briggs and was

facing the death penalty.  Id. at 411.  Upon reviewing the material the defendant submitted to support his motion, the trial court found that, although it was "voluminous, . . . it [was] not the kind of adverse inflammatory publicity that raises a concern about inherent prejudice."  Id. at 423.  Although the court found that "some of the articles and television clips about the death of Officer Briggs had an emotional tone, very few related facts about the defendant in a way that could be described as prejudicial."  Id.  Under those circumstances, the court denied the defendant's motion for a change in venue.  Id. at 422.  We upheld the trial court's decision, concluding that, despite the extensive media coverage, the defendant had "not presented us with the type of emotionally charged, inflammatory, sensationalistic coverage needed to support a presumption of prejudice."  Id. at 433 (quotation omitted).

The defendant in State v. Gribble, 165 N.H. 1 (2013), was charged with, among other crimes, first degree murder arising out of a home invasion in Mont Vernon, which resulted in the death of Kimberly Cates.  Gribble, 165 N.H. at 5.  The crimes in that case "generated an extensive amount of media coverage."  Id. at 15.  One article described the murder as "grisly."  Id. (quotation omitted).  Other accounts described it as "vicious," "savage," "gruesome," "horrific," and "deprav[ed]."  Id. at 21 (quotations omitted).  Media accounts also related that, in the trial of one of the defendant's co-conspirators, Steven Spader, a third co-conspirator testified that he saw "[the defendant] take his knife and put it on the right side of Cates' throat" and then on the other side of her throat.  Id. at 15 (quotation, brackets, and ellipsis omitted).  After Spader's conviction, "[s]everal articles and a local television station . . . reported that the defendant admitted that he committed the crimes charged but [that he] pleaded not guilty by reason of insanity."  Id.  Although "some of the news reports were accusatory in content and included graphic descriptions of the crimes," we agreed with the trial court that most consisted of "straightforward, factual accounts of the crimes."  Id. at 21.  Accordingly, we held that the pretrial publicity in the case was insufficient to establish a presumption of prejudice.  Id. at 28.

The defendant here concedes that the publicity in his case was not "greater or more inflammatory" than that in Addison, 165 N.H. at 425-33 or Gribble, 165 N.H. at 19-28.  Moreover, he has not argued that the trial court erred when it found the material he submitted consisted of "straightforward, unemotional factual accounts of events and of the progress of investigations," and that "the media coverage surrounding this case was most extensive immediately after the shooting in March 2012 and ha[d] diminished substantially since that time."  (Quotation omitted.)  Under these circumstances, we conclude that he has failed to establish that a presumption of prejudice arose from the pretrial publicity.  See Addison, 165 N.H. at 433.

10

To the extent that the defendant argues that the pretrial publicity in this case permeated the venire and that the voir dire process used by the court was insufficient to eliminate the prejudice to him from trying the case in Manchester, we conclude that this argument is also unavailing. See id.; Gribble, 165 N.H. at 23. "The manner in which voir dire is conducted is wholly within the sound discretion of the trial court, and no hard-and-fast formula dictates the necessary depth or breadth of voir dire." Gribble, 165 N.H. at 23-24 (quotations, citation, and brackets omitted). Whether a prospective juror is free from prejudice is a determination to be made in the first instance by the trial court on voir dire. Id. at 24; see Skilling v. United States, 561 U.S. 353, 386 (2010) (observing that "[j]ury selection . . . is particularly within the province of the trial judge" (quotation omitted)). Accordingly, as recognized by the Supreme Court:

> Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record — among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. In contrast to the cold transcript received by the appellate court, the in-the-moment voir dire affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service.

Skilling, 561 U.S. at 386 (citation omitted); Gribble, 165 N.H. at 24.

The defendant merely argues that "his case differs from" Addison and Gribble because the defendants in those cases were "afforded extensive jury selection procedures," which were denied him. The fact that the defendant did not receive the same jury selection procedures as did the defendants in Addison and Gribble is of no moment. As the defendant acknowledges, the defendants in Addison and Gribble had more peremptory challenges than he did because they were entitled to them by statute. See RSA 606:3 (entitling a defendant in a capital case to twenty, a defendant in a first degree murder case to fifteen, and a defendant in any other criminal case to three, peremptory challenges). Moreover, "[t]he practice in New Hampshire has been that jury voir dire is conducted solely by the trial judge, except in capital and first-degree murder cases." State v. Wamala, 158 N.H. 583, 592 (2009). But see Laws 2014, 40:1 (effective Jan. 1, 2015). Here, although the defendant was not charged with either capital or first degree murder, the trial court allowed the attorneys to question individual prospective jurors in the presence of the other prospective jurors.

Further, unlike the defendants in Addison and Gribble, the defendant here has not attempted to demonstrate that the community from which the

jury was drawn was so hostile, as a result of pervasive media coverage, that drawing an unbiased jury was impossible.  See Addison, 165 N.H. at 433-39; Gribble, 165 N.H. at 23-28.

Accordingly, we hold that there was no manifest error in the trial court's denial of the defendant's motion for a change of venue, following its denial of his motion for additional peremptory challenges and/or attorney-conducted, individual juror voir dire.  As the Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances, see Gribble, 165 N.H. at 28, we reach the same result under both constitutions.

Affirmed.

HICKS, CONBOY, LYNN, and BASSETT, JJ., concurred.