NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Hillsborough - northern judicial district
No. 2014-407

THE STATE OF NEW HAMPSHIRE

v.

RICHARD SCOTT

Argued: March 31, 2015
Opinion Issued: May 12, 2015

Joseph A. Foster, attorney general (Nicholas Cort, assistant attorney general, on the brief and orally), for the State.

Dana Alan Curhan, of Boston, Massachusetts, by brief and orally, for the defendant.

CONBOY, J. The defendant, Richard Scott, appeals his convictions, following a jury trial, on one count of attempted murder, see RSA 629:1 (2007); RSA 630:1-a (2007), and one count of being a felon in possession of a deadly weapon, see RSA 159:3 (2014). We affirm.

I

The jury could have found, or the record supports, the following facts. On July 26, 2013, Terrence Jackson was at a friend's apartment in Manchester

with a woman named Darlene.  At around 6:00 a.m., Jackson heard another friend, "Jay," banging on the back door of the apartment.  Jackson testified that he had known "Jay" for only a few months, but that the two of them often spent time together "hang[ing] out" and selling drugs.  Jackson later identified "Jay" as the defendant.

Jackson testified that he did not open the door for the defendant because he had "never seen [the defendant] that angry before."  Shortly thereafter, Jackson received a telephone call from a woman who wanted to stop by the apartment because he was selling drugs.  Jackson testified that it was "not unusual" for someone to come to the apartment at 6:00 a.m.

Approximately 20 minutes later, the woman who had called Jackson entered the apartment, followed by the defendant.  The defendant and Jackson had "words."  Darlene and the other woman left, leaving only Jackson and the defendant in the apartment.

The defendant confronted Jackson about threatening text messages that he had received from one of Jackson's friends.  The defendant was also upset because Jackson owed him approximately $600 for drugs.  The defendant eventually pulled out a gun, which was the same gun that Jackson had previously lent to the defendant.  Jackson threw approximately $600 on the floor, but the defendant did not pick up the money, stating that he knew that Jackson had more money on him.  Jackson testified that he did have about $10,000 in his back pocket from selling drugs.

As the conversation between the defendant and Jackson escalated to an argument, two women entered the apartment for a short period of time, during which the defendant put the gun away.  Once the women left, the defendant pulled the gun out again, pointed it at Jackson, and asked him for the money.  Jackson told the defendant that if he wanted the money, he would have to shoot him.  The defendant then said "[t]ake this," shot Jackson in the face, and took the $10,000 that Jackson had in his pocket.  As he left the apartment, the defendant pointed the gun at Jackson again and Jackson heard a "click."

After being shot, Jackson disposed of drugs in his possession and changed his shorts because there was drug residue in his pockets.  He then called 911.  Jackson told the 911 operator that he had been shot, but that he did not know who shot him or the type of gun used; however, at trial, Jackson testified that he lied to the operator about not knowing who shot him and not knowing what gun was used because he was afraid of the defendant and the police.  After the police arrived at the scene, Jackson told an officer that he was shot while sleeping and that he could not identify the shooter.

Jackson was taken to the hospital, and the police interviewed him there. Jackson again told the police that he was sleeping when he was shot.  At trial,

2

however, he admitted that he lied to the police because he was scared. Jackson also provided the police with a description of the shooter.

The day after the shooting, Detective Mucci and another detective interviewed Jackson while he was still in the hospital. Mucci testified that he knew that the apartment where Jackson had been shot was being investigated for drug activity. He also testified that he had had prior contact with various individuals from that apartment, including Jackson and someone who went by the name of "Jay."

When the other detective stepped out of the hospital room, Mucci asked Jackson whether one of his acquaintances had shot him. When Jackson did not respond to this question, Mucci asked if "Jay" had shot him. Although Jackson did not respond initially, he eventually asked Mucci to repeat the name. Mucci repeated the name and Jackson responded that it was "Jay" who shot him. Jackson then provided a more detailed description of the shooter than he had provided earlier. After Jackson was released from the hospital, the police presented him with a photographic lineup. Jackson selected the defendant's photograph and wrote on the lineup document that it was the defendant who shot him.

II

The defendant was charged with attempted murder and being a felon in possession of a deadly weapon. Before trial, he moved to suppress Jackson's identification, arguing that it was unnecessarily suggestive and amounted to an improper one-man show-up because Mucci provided Jackson with the name "Jay." After a hearing, the court (Mangones, J.) denied the motion. The court concluded that the identification was not unnecessarily suggestive because Jackson was "very familiar with his alleged attacker"; thus, "the fact that Detective Mucci had asked if 'Jay' may have been the shooter likely had little influence over Jackson's identification of the defendant." The court also determined that, even if the identification was unnecessarily suggestive, the factors set forth in Neil v. Biggers, 409 U.S. 188 (1972), weighed in the State's favor.

At trial, Jackson testified under a grant of immunity. Although he admitted to committing certain drug-related crimes and to lying to the police during the investigation, he testified that he told the truth at trial, which included identifying the defendant as the person who shot him. Jackson further explained that his reluctance to initially identify the shooter and talk with police was because he did not "want to look like a rat or a snitch" as that could affect his "street reputation."

The defendant stipulated that he was a convicted felon, and that, if he were convicted by the jury on the attempted murder count, he would,

3

consequently, be guilty of the felon in possession count. At the close of the State's case-in-chief, the defendant moved to dismiss the attempted murder charge. The trial court (Brown, J.) denied the motion. Subsequently, the jury found the defendant guilty of attempted murder, and, pursuant to the stipulation, he was deemed guilty of the remaining count. This appeal followed.

III

On appeal, the defendant first argues that the trial court erred by denying his motion to dismiss because the court failed to consider his challenge to the weight of the evidence. The State counters that the defendant did not preserve this issue. We agree with the State.

In State v. Hill, 163 N.H. 394, 396 (2012), we explained that "the nature of a challenge to the weight of the evidence requires that it be raised as a motion to set aside a verdict actually rendered." Here, although the defendant moved to dismiss the attempted murder charge at the close of the State's case, he failed to file a motion to set aside the verdict after the verdict was rendered. Accordingly, this issue has not been preserved for our review. See Hill, 163 N.H. at 396; see also State v. Alwardt, 164 N.H. 52, 57 (2012) ("Because the relief requested by the defendant was dismissal of the indictment rather than a new trial and because his challenge was made at the close of the State's case rather than after the jury returned its verdict, we conclude that this issue was not properly preserved for our review.").

We decline the defendant's suggestion, made for the first time at oral argument, that we address this argument under the plain error rule. See Sup. Ct. R. 16-A. Because the defendant has not briefed this contention, we consider it waived. See State v. Davis, 149 N.H. 698, 703 (2003) (argument made at oral argument, but not briefed or raised in the trial court, deemed waived).

The defendant further urges us to modify our standard for reviewing claims based upon the sufficiency of the evidence. Pursuant to our standard, "[w]hen considering a challenge to the sufficiency of the evidence, we objectively review the record to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, considering all the evidence and all reasonable inferences therefrom in the light most favorable to the State." State v. Germain, 165 N.H. 350, 354-55 (2013) (quotation omitted; emphasis added). The defendant argues that, rather than utilizing our "any rational trier of fact" standard, we should, based upon concerns for due process, employ a "reasonable jury" standard. Assuming that the defendant's proffered articulation of the standard is qualitatively different from our established standard, we are not persuaded that the circumstances of this case warrant such a change.

4

To the extent that the defendant challenges the sufficiency of the evidence pursuant to our standard, see id., he appears to concede in his brief that the evidence was sufficient. But, even assuming that he does not make this concession, we conclude that any such argument is insufficiently developed for our review. See State v. Fernandez, 152 N.H. 233, 239-40 (2005).

IV

The defendant next argues that the trial court erred by denying his motion to suppress Jackson's identification and by subsequently allowing Jackson's in-court identification. He claims that the admission of the out-of-court and in-court identifications violated his rights under the State and Federal Due Process Clauses. See N.H. CONST. pt. I, art. 15; U.S. CONST. amends. V, XIV. We first address the defendant's claims under the State Constitution and rely upon federal law only to aid our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

On appeal from a motion to suppress identification evidence, we will not overturn the trial court's ruling unless, after reviewing the record, we conclude that it is contrary to the weight of the evidence. State v. Webster, 166 N.H. 783, 788 (2014). In making this determination, we ask whether the identification procedures used were so unnecessarily suggestive and conducive to irreparable mistaken identification that the defendant was denied due process of law. Id.

The defendant has the initial burden of establishing that the identification procedure was unnecessarily suggestive. Id. Only if the defendant has met this burden must we then consider the Biggers factors to determine whether the identification procedure was so suggestive as to render the identification unreliable and, thus, inadmissible. Id.; see Biggers, 409 U.S. at 199-200. Under Biggers:

> the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Biggers, 409 U.S. at 199-200. If the out-of-court identification is found inadmissible under this two-step analysis, the subsequent in-court identification will also be inadmissible unless it did not result from, and was independent of, the improper identification procedure. See State v. Perri, 164 N.H. 400, 406 (2013).

5

The defendant argues that, because Jackson did not identify the defendant until Mucci asked if "Jay" shot him, the out-of-court identification procedure was unnecessarily suggestive because it amounted to an improper one-man show-up. He also asserts that the out-of-court identification was unreliable, and thus inadmissible, because of the varying accounts that Jackson provided to the police before eventually identifying the defendant as the perpetrator. He further claims that, because Jackson's subsequent in-court identification of the defendant "resulted directly from the tainted out-of-court identification," the in-court identification also should have been suppressed.

Contrary to the defendant's argument, the identification procedure used in this case did not constitute a show-up. In a show-up, "a single individual arguably fitting a witness's description is presented to that witness for identification." United States v. Brownlee, 454 F.3d 131, 138 (3d Cir. 2006); see Brisco v. Ercole, 565 F.3d 80, 88 (2d Cir. 2009) (observing that a show-up "involves the presentation of a single suspect to a witness by the police as opposed to a lineup, in which several individuals are presented [by] the police, only one of whom is the suspect" (parentheses omitted)).

Here, however, there was no evidence that when Mucci asked Jackson if "Jay" had shot him, he presented any person or photograph to Jackson for him to identify. Cf. State v. Leclair, 118 N.H. 214, 218 (1978) (explaining that the out-of-court identification was based on a single photograph and amounted to a one-man show-up). Further, there was no evidence that in asking the question, Mucci conveyed an opinion to Jackson that he thought "Jay" was the shooter or that he wanted Jackson to identify "Jay" as the shooter. See State v. Bell-Rogers, 159 N.H. 178, 181 (2009) (determining whether the out-of-court identification procedure was unnecessarily suggestive requires examining whether the police implicitly conveyed their opinion of the criminal's identity to the witness); cf. Leclair, 118 N.H. at 218 (explaining that the identification procedure was unnecessarily suggestive, in part because the police, by various means, indicated to the witness that the defendant was the one they wanted him to identify). Instead, Mucci simply asked Jackson a question as part of his investigation into the shooting, and Jackson responded affirmatively that it was "Jay" (subsequently identified as the defendant) who shot him.

Accordingly, we conclude that the defendant has not met his burden of establishing that Mucci's question to Jackson about whether "Jay" was the shooter constituted an unnecessarily suggestive identification procedure. We, therefore, need not consider the Biggers factors to determine whether the identification procedure was so suggestive as to render the identification unreliable. See Webster, 166 N.H. at 788. Because the out-of-court identification was not improper, it did not, contrary to the defendant's assertion, impermissibly taint Jackson's subsequent in-court identification. See State v. King, 156 N.H. 371, 377 (2007). Accordingly, we conclude that the

6

trial court did not err by admitting Jackson's identifications of the defendant. See Bell-Rogers, 159 N.H. at 182.

Because the Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances, see id. at 182-83; United States v. Saunders, 501 F.3d 384, 389-90 (4th Cir. 2007), we reach the same result under the Federal Constitution as we do under the State Constitution.

V

The defendant next argues that the trial court committed plain error by allowing the prosecutor to make certain comments about the "drug world" during her closing argument. Under the plain error rule, we may consider errors not raised in the trial court. See Sup. Ct. R. 16-A; State v. Guay, 164 N.H. 696, 703 (2013). However, the rule should be used sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result. Guay, 164 N.H. at 704. To find error under this rule: (1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity, or public reputation of judicial proceedings. Id.

The defendant asserts that the prosecutor's closing argument, which contained repeated references to the "drug world" to explain some of the actions taken by Jackson and others, was based upon the prosecutor's supposed "personal knowledge of how things work in the so-called drug world" rather than upon the facts in evidence. According to the defendant, "most of what [the prosecutor] argued could not be fairly inferred from the evidence at trial," and, therefore, the trial court committed plain error by permitting the prosecutor's argument.

The State may not ask the jury to base its decision upon evidence not in the record. State v. Sanchez, 152 N.H. 625, 628 (2005). However, a "prosecutor may draw reasonable inferences from the facts proven and has great latitude in closing argument to both summarize and discuss the evidence presented to the jury and to urge them to draw inferences of guilt from the evidence." State v. Bisbee, 165 N.H. 61, 68 (2013) (quotation omitted).

During closing argument, the prosecutor made numerous references to the defendant's "drug world." For instance, the prosecutor stated that the shooting "took place in the Defendant's world of drug dealing and drug usage" and "to properly evaluate the evidence in this case," the jurors had to put themselves "into the dark, mostly-unknown-to-us world of drug dealers and drug users, the world of the Defendant." The prosecutor observed that the "Defendant's world" is one where there is a "revolving door" of people in and out of homes in the early morning hours, where business transactions are done in

7

cash, and where people keep their inventory in their pockets and carry guns to protect their assets. The prosecutor further stated that the defendant's drug world was one of "self-preservation," where "the perfect crime was ripping off a drug dealer" because such people do not report crimes to the police or willingly aid the police in investigations due to the effect on their "street credibility" from being considered a "snitch" or a "rat." The prosecutor also noted that, after being shot, Jackson sought to protect himself in this drug world by disposing of drugs, changing his shorts, and distancing himself from both the police and the shooter by not initially identifying the person who shot him.

At trial, Jackson testified that he and the defendant were drug dealers and that it was not unusual for people to come by the apartment early in the morning. Jackson further testified that he owed the defendant approximately $600 for drugs and that he had approximately $10,000 in his back pocket from selling drugs. Additionally, Jackson testified that, after being shot and before calling 911, he disposed of drugs that he possessed and changed his shorts because they contained drug residue. Jackson also admitted that he lied to the police because of his fear of the defendant and the police, as well as the fact that he did not want to be a "rat" or a "snitch" out of concern for his "street reputation." Moreover, Mucci testified that, prior to the shooting, the apartment where Jackson was shot was being investigated by the police for drug activity.

Although no witness used the specific term "drug world" at trial, given the evidence presented at trial, the prosecutor's closing remarks were not improper. The prosecutor simply drew reasonable inferences from the testimony at trial; her comments were within the latitude accorded prosecutors when summarizing and discussing the evidence presented. See id. Because there was no error, we reject the defendant's plain error argument as to the statements the prosecutor made during her closing argument regarding the defendant's "drug world."

VI

The defendant next argues that the trial court committed plain error when it failed to instruct the jury, sua sponte, on certain lesser-included offenses, such as assault.

We have held that the trial court has the discretion to instruct the jury, sua sponte, regarding lesser-included offenses or to consider them as the trier of fact in a non-jury trial. In re Nathan L., 146 N.H. 614, 620 (2001). In reaching this conclusion, we rejected the view of some courts that a trial court is always obligated, whether requested by the parties or not, to instruct on lesser-included offenses whenever the evidence warrants it. See id. at 617-20. Because the trial court is not obligated to instruct the jury, sua sponte, on lesser-included offenses, and because we are not persuaded that the court

unsustainably exercised its discretion here, there was no error. Accordingly, the trial court's failure to instruct the jury, sua sponte, on lesser-included offenses did not amount to plain error. See Guay, 164 N.H. at 704.

VII

To the extent that the defendant asserts an ineffective assistance of counsel claim, we decline to address it pursuant to State v. Thompson, 161 N.H. 507 (2011). See State v. Gibbs, 164 N.H. 439, 444 (2012). We maintain a strong preference for collateral review of ineffectiveness claims. Thompson, 161 N.H. at 527. Direct appellate review is permissible only in the extraordinary case where the factual basis of the claim appears indisputably on the trial record. Id. Here, however, the defendant's limited argument cannot be decided on the face of the trial record. See Gibbs, 164 N.H. at 444-45. Without an additional developed record, we cannot determine whether the challenged conduct of the defendant's trial counsel was part of a reasonable trial strategy; accordingly, we decline to address this argument. See id. Our ruling, however, is without prejudice to any proper ancillary proceeding. See id.

Finally, any issue raised in the defendant's notice of appeal that he has not briefed is deemed waived. See State v. Blackmer, 149 N.H. 47, 49 (2003).

Affirmed.

DALIANIS, C.J., and HICKS, LYNN, and BASSETT, JJ., concurred.